UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| (1) MOISES ANTONIO SOTO and | ) | Criminal No. 22-cr-40027-MJJ |
| (2) KIERSTEN SOTO, | ) | **Leave to file granted on April 15, 2026** |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |

## GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION FOR NEW TRIAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33(b)(1)

The United States of America, through its undersigned counsel, opposes Defendants MOISES and KIERSTEN Soto's Motion for a New Trial Pursuant to Federal Rule of Criminal Procedure 33(b)(1) ("Defendants' Motion"). Docket No. 286.[1] On September 22, 2025, after a six-day jury trial, the jury convicted both defendants of sex trafficking and conspiracy to engage in sex trafficking and further convicted KIERSTEN of interstate travel to promote prostitution. Docket No. 257. Defendants now seek to discard the jury's verdict based entirely on the Judge's purported bias at their January 23, 2026 sentencing hearings—*four months after trial*— in which the Judge provided the government with a note and small gift for the proven victim in this case ("Victim 1"). The note and gift were expressions of sympathy and hope from the Judge to Victim 1, who had been brutalized and trafficked by the defendants, and occurred long after the defendants had been found guilty by the jury. Because mere expressions of sympathy and compassion for a

---

[1] In their Motion, Defendants also moved for the recusal of the trial judge, U.S. District Court Judge Margaret R. Guzman. On February 20, 2026, Judge Guzman issued an order of recusal. Docket No. 287. That same day, the case was reassigned to U.S. District Court Judge Myong J. Joun. Docket No. 288. Throughout this opposition, when referring to Judge Guzman, counsel uses the "Judge," and when referring to Judge Joun, uses the "Court."

crime victim do not, in any way, support a finding of actual bias against the defendants, their Motion fails. Moreover, even if this Court were to find there was some actual or perceived bias in the sympathy note from the Judge, this occurred *at sentencing*, long after the defendants had been found guilty, and cannot be imputed back in time to attack evidentiary rulings made *during trial*. Finally, the impeachment evidence excluded from trial (1) was properly excluded, and (2) was neither material, nor would its admission have resulted in an acquittal at trial. For all of these reasons, this Court should deny Defendants' Motion for a New Trial.

Out of an abundance of caution, and given the facts described below, the government consents to a resentencing of both defendants. But that is the extent of the appropriate remedy, given that the purported bias occurred at the sentencing hearing, four months *after* the jury found the defendants guilty.

<div align="center">

**FACTUAL BACKGROUND**[2]

*Summary*

</div>

In 2022, when Victim 1 was 20 years old, she resided with her half-sister, KIERSTEN Soto, and her brother-in-law, MOISES Soto at 64 Everard Street, Worcester, Massachusetts. From February through May 2022, KIERSTEN and MOISES used force, threats of force, threats of involuntary commitment, threats of abandonment, and coercion, namely the giving and withholding of Percocets and fentanyl from Victim 1, to force Victim 1 to engage in commercial sex in Massachusetts, New Hampshire, Rhode Island, and Connecticut. KIERSTEN arranged

---

[2] These facts are taken from the Presentence Investigation Reports ("PSRs") for both defendants, trial transcripts, and trial exhibits. During trial, the jury heard testimony from multiple witnesses including Homeland Security Investigations ("HSI") Special Agent Stacy Fleischmann, Victim 1, Bradford Darrach, Adrian Morin, FBI Special Agent Jake Hardie, Grace Darrach, and HSI Task Force Officer Soren Levenson. The government admitted exhibits including text messages, Facebook messages, photographs of Victim 1's injuries, subpoena returns from CashApp and Venmo, among other evidence.

prostitution dates for Victim 1 using messages through the website Seeking.com ("Seeking"), instructed Victim 1 regarding which sex buyers to speak to and how to speak with them, arranged transportation to the prostitution dates through the customers, Uber, and Bradford Darrach. KIERSTEN routinely threatened Victim 1 when she failed to respond to KIERSTEN's messages, when she missed a prostitution date, when she did not make enough money, when she did not return to their home quickly enough with drugs, or when KIERSTEN believed Victim 1 was speaking with others about KIERSTEN's and MOISES's criminal activities. MOISES arranged for Victim 1 to pick up drugs from their drug supplier "Bebo," threatened Victim 1, and physically beat Victim 1 with his fists, beat her with wooden dowel rods, choked her, and pushed her up against walls to keep Victim 1 prostituting for KIERSTEN's and MOISES's financial benefit.

Throughout the period of February through May 2022, Victim 1 was badly addicted to fentanyl and Percocets. When she did not receive the fentanyl she needed, she would suffer agonizing withdrawals – shaking, vomiting, enduring intense physical pain. As described below, the defendants even recorded Victim 1 suffering from brutal withdrawal symptoms and begging for a Percocet (a "P") while the defendants berated and threatened her.

*Counts One and Two – Conspiracy to Commit Sex Trafficking;*
*Sex Trafficking by Force, Fraud, and Coercion.*

In early 2022, Victim 1 signed up for an account on Seeking, a website advertising prostitution services. Ex. 36[3] (Seeking profile); Exs. 20.01 – 20.09 (Seeking profile pictures); Trial Tr. Day 2 at 61. KIERSTEN and MOISES knew she had signed up for this account but did not believe Victim 1 could make any money through prostitution. Trial Tr. Day 2 at 65. After Victim 1 returned from her first prostitution date, she had earned $300 and had to give that money to

---

[3] Exhibits refer to trial exhibits.

KIERSTEN and MOISES. *Id.* at 65-66, 106. KIERSTEN then took Victim 1's username and password and took over her Seeking account. *Id.* at 66. KIERSTEN began regularly communicating with customers, posing as Victim 1, and arranging prostitution dates for Victim 1. Exs. 3.03, 29, 30; Trial Tr. Day 2 at 56, 67, 69, 71, 74-75. KIERSTEN would then send Victim 1 a screenshot of these Seeking communications and direct Victim 1 to call or text the phone number provided by the customer. Exs. 4.08-4.11, 29, 30; Trial Tr. Day 2 at 69, 71, 84-85. KIERSTEN also sold explicit photos of Victim 1 to potential customers. Exs. 4.06, 38; Trial Tr. Day 2 at 81-82. KIERSTEN would then instruct Victim 1 in how to speak with the customers – keep the customers interested, negotiate for sexual services, establish prices, and secure transportation. Exs. 4.02, 4.05, 4.06, 4.08, 4.10, 10.19, 29; Trial Tr. Day 2 at 85-88, 98-99, 109-112. KIERSTEN and MOISES would then send Victim 1 out to perform the prostitution dates and regularly check in with Victim 1 about her progress – how many dates she had, how much money she made, when she was returning home. Exs. 4.07, 4.09, 4.11, 10.17, 10.23, 24.10, 24.12, 24.15, 31, 32; Trial Tr. Day 2 at 89, 96-98, 120-121; Trial Tr. Day 4 (Darrach Testimony) at 38, 42, 64, 67.

> Ex. 24.15: "I need you to shower, and makeup and you had a shit ton of meets planned for today. I told you couldn't not pull in a couple grand a day to be all set, but your all set and crying that you're tired. **I do all the work except showing up to meets.**" (Emphasis added).

Victim 1 was required to make $1,500 per day and would regularly engage in three to five prostitution dates per day. Trial Tr. Day 2 at 99, 161. Each prostitution date was between $400 – $500. *Id.* at 99. KIERSTEN and MOISES did not permit Victim 1 to refuse a prostitution date. *Id.* at 123-124. KIERSTEN would negotiate with prostitution customers about what sexual acts they could perform on Victim 1 and whether or not the customer had to wear a condom when they had sex with Victim 1. Exs. 10.18, 10.19 ("And what time and address in Acton he wanted to know if you could do bj no wrap and swallow just FYI"); Trial Tr. Day 2 at 87, 109. KIERSTEN

and MOISES collected any cash Victim 1 made from prostitution dates when she returned to the apartment. Trial Tr. Day 2 at 106-107. KIERSTEN regularly arranged with sex buyers to pay KIERSTEN directly to her CashApp or Venmo accounts. Exs. 24.12, 32. Trial Tr. Day 2 at 104-105, 118. Trial Tr. Day 4 (Darrach and Morin Testimony) at 56-57, 125, 133. In one instance, Victim 1 told MOISES and KIERSTEN that she had been anally raped by a customer. Trial Tr. Day 2 at 178; Trial Tr. Day 4 (Darrach Testimony) at 39. The defendants called her a liar but then forced the sex buyer to pay additional money because they charged more for anal sex and the buyer had not paid enough. Ex. 11; Trial Tr. Day 2 at 178; Trial Tr. Day 4 (Darrach Testimony) at 41.

KIERSTEN and MOISES were together all the time inside 64 Everard Street. Trial Tr. Day 2 at 119. KIERSTEN and MOISES required Victim 1 to pick up their drugs, their groceries, and their take-out orders. Exs. 4.10, 8.01, 32-34; Trial Tr. Day 2 at 103; Trial Tr. Day 4 (Darrach Testimony) at 47. KIERSTEN and MOISES rarely, if ever, left their apartment. Trial Tr. Day 2 at 103, 119; Trial Tr. Day 4 (Darrach Testimony) at 53.

Through Facebook and text messages, KIERSTEN and MOISES would regularly threaten Victim 1 with violence, homelessness, or being "sectioned" (involuntarily committed by a state judge as a danger to herself or others). Exs. 3.02, 4.03, 4.09, 24.02, 24.13, 24.14; Trial Tr. Day 2 at 127-128, 137-138.

> Ex. 4.05: "You make tonio wait in pain you're gonna have two black eyes"
>
> Ex. 4.09: "Antonio's very mad since he's been pushing and super sick and this is your third day of what's looking…what's looking like a single meet day today…you know the deal…one more day with only two meets and you know the deal….Okay"
>
> Ex. 4.12: Thank you for being a cunt about it [Victim 1]…Tonio's so sick…He hasn't slept in three days…Are you looking to die
>
> Ex. 7: "And if I tell him you were a chatter box outside when you have a meet waiting, he's going to fucking kill you"

5

Ex 10.14: "We need the money you got from the meet…Tonio is about to go ballistic"

Ex. 10.01: "You're lucky I don't section you rn…tonio told you not to play games." "When you get in here you get in this fucking house or so help me God I will lock you outside [Victim 1]"

Ex. 10.15: [Victim 1]…message back…missed your call…[Victim 1]you are kicked out today if we miss this guy…I hope you know that…[Victim 1]… '[Victim 1]… [Victim 1]…"

Ex. 10.21: "Did you make any money…Antonios about to kick you out..you look like you're doing this on purpose…I gave Antonio the cash I had"

Ex. 10.21: "I didn't even get food because it was $70…Don't care and no one said not to…And no one feels guilty for you. You really have done this everytime. Pray you find a way to make that up by tonight…oh wait…no you can't."

KIERSTEN regularly threatened Victim 1 with MOISES's violence. Trial Tr. Day 2 at 141, 145-147, 149. These were not idle threats. When Victim 1 failed to answer her phone, or missed a prostitution date, or did not make enough money, or when either KIERSTEN or MOISES thought Victim 1 was hiding drugs, MOISES beat Victim 1 with his fists. *Id.* at 107, 114, 131. MOISES beat her with sticks and wooden dowel rods. *Id.* at 126, 152, 154-155. MOISES choked Victim 1. *Id.* at 126-127. In one instance, MOISES choked Victim 1 out so badly that she had to play dead to get him to stop. *Id.* at 174-176. When he stopped choking her, Victim 1 ran outside. *Id.* MOISES chased her, grabbed her, pulled her back inside, pushed her up against a wall, and beat her some more. *Id.* When MOISES would get mad, Victim 1 testified that he would "spaz out," go crazy, yell, "break shit," and hit her. *Id.* at 151. All these beatings and assaults occurred inside their apartment in KIERSTEN's presence. These beatings caused Victim 1 injuries. Exs. 60-69; Trial Tr. Day 4 (Darrach Testimony) at 80-83; Trial Tr. Day 5 (Grace Darrach and Levenson Testimony) at 16, 84. When the police found her on May 26, 2022, they took photos of her injuries. Exs. 41, 43 - 47, 50, 53; Trial Tr. Day 2 at 174; Trial Tr. Day 4 (Morin Testimony) at 152; Trial Tr.

Day 5 (Levenson Testimony) at 90. The photos show Victim 1's busted lip, swollen nose, black eye, and bruises on her arms, legs, and torso. Trial Tr. Day 2 at 174-177; Trial Tr. Day 5 (Levenson Testimony) at 90-92. Victim 1 testified that MOISES caused all of these injuries. Trial Tr. Day 2 at 174-177.

KIERSTEN and MOISES also controlled Victim 1's drug usage. Ex. 24.11; Trial Tr. Day 2 at 100-102, 158, 166. KIERSTEN and MOISES repeatedly sent Victim 1 to pick up drugs from their dealer, Bebo. Exs. 24.07, 32, 33, 34; Trial Tr. Day 2 at 121-122, 129-130, 142. MOISES and KIERSTEN would regularly withhold "doses" if Victim 1 failed to make enough money, was slow in responding to their messages, or missed a prostitution date:

> Ex. 4.06: [Victim 1] you know you're gonn have to come up with something first…I get you had a dose to take a break…but youre gonna suffer if you don't come up with something…because tonio I'd saying you're looking at TV more than trying..otherwise we're really fucked."
>
> Ex. 4.07: "Tonios literally going to restrict you for whatever amount of time you didn't answer times 2. So you stop doing this."
>
> Ex. 4.09: "Come for a dose if you're getting one."
>
> Ex. 4.11: "You gave Brad some time I knew just trying to figure out picking up and take some p girl."
>
> Ex. 10.21: You made 70 bucks? All day? If he doesn't eat I'm not giving you anymore doses…"
>
> Ex. 10.21: "Dude it's Antonio I'm throwing this shit bag food in the trash and you ain't getting shit till I get more tomorrow…When I get the right fucking meal from China sea tomorrow I'll give you a dose"
>
> Ex. 10.21: "Are you gonna be able to stop by bebos…how much am I getting…how much cash you got…350…okay I'll get 600 worth….Not getting more ps because we have enough for you…and I'm not gonna actually withhold doses."

KIERSTEN also searched Victim 1 for drugs to determine if Victim 1 was hiding any drugs from KIERSTEN and MOISES. Ex. 8.03; Trial Tr. Day 2 at 131; Trial Tr. Day 4 (Darrach

Testimony) at 50-51. In one instance, witnessed by Darrach, KIERSTEN pushed Victim 1 against the wall and told Victim 1 that KIERSTEN would "tear [Victim 1's] vagina apart looking for drugs." Trial Tr. Day 4 (Darrach Testimony) at 50. KIERSTEN confirmed to Bebo that MOISES also beat Victim 1 if she attempted to hide drugs from them:

> Ex. 8.03: "It's kiersten tonios gonna beat [Victim 1's] ass if she doesn't get that ebt back tonight…He's probably gonna beat her ass cause I searched her and found a p on her too. She almost oded twice yesterday."

In one incident, which KIERSTEN recorded on video and posted to Facebook, Victim 1 is cowering in the corner, shaking, and begging for a "p," a Percocet, as she suffers through painful withdrawals. Exs. 22.01 – 22.04; Trial Tr. Day 2 at 178-180. While Victim 1 is begging for a dose," KIERSTEN and MOISES berate, threaten, and demean her:

| | |
|---|---|
| VICTIM 1: | My head hurts so bad. |
| MOISES: | "Your head hurts so bad" huh? Your head hurts so bad. Bet it does. |

\*\*\*

| | |
|---|---|
| KIERSTEN: | Why did you do this to us? |
| MOISES: | Show me you remember what you said. |
| VICTIM 1: | *crying* Ahh my head hurts. My head hurts. |
| MOISES: | Tell me what you said. |
| KIERSTEN: | Shut up. Stop screaming. |
| MOISES: | [Victim 1, Victim 1], so why did you? Why did you— so what is it? I give you this dose and what? |
| VICTIM 1: | I go to the police calmy and I don't say anything ever. |
| MOISES: | What are you trying to say? What are you trying to say? What do you think you have to say to these people. |
| VICTIM 1: | They're not going to believe me. |
| MOISES: | What are you trying to say to these people kid? |
| KIERSTEN: | Literally you- |
| VICTIM 1: | That we all do drugs. |
| MOISES: | Alright—what else you trying to say? |
| VICTIM 1: | That was it. |
| KIERSTEN: | Yeah I'm sure |
| MOISES: | Okay. (end video) |
| VICTIM 1: | Please? Please? Please, no please? |

\*\*\*

| | |
|---|---|
| MOISES: | Yeah, no. |
| VICTIM 1: | Please? Please? |
| MOISES: | What were you planning on, like what were you planning on saying? Bro. |
| VICTIM 1: | That I'm a junkie. |
| MOISES: | Nah, you plan on fucking snitching on us? |
| VICTIM 1: | No |
| MOISES: | Oh what so you get a dose and you're not gonna make up shit? |
| VICTIM 1: | No I just need a dose, my head hurts so bad. |
| MOISES: | So you're not gonna make up shit? |
| VICTIM 1: | Nooo Im not gonna make up shit. Im not gonna make up shit. |
| KIERSTEN: | [Victim 1], you told us yesterday if Brad took you to the hospital, that you were gonna say he was a rapist that kept you hostage. You admitted that to me yesterday. |
| MOISES: | You tryna snitch on us? |
| VICTIM 1: | Noo. Noo. |
| MOISES: | So what do you want to not snitch? |
| KIERSTEN: | What do you want? |
| MOISES: | What do you want to not make up shit and fucking cause problems for us? |
| VICTIM 1: | Can I please have a "P"? |
| MOISES: | No like what are you asking for? Tell us what you're fucking asking for like what you want. What do you fucking want? Since you wanna fucking making threats what is your fucking threat stupid? |

At the end of the trafficking period, MOISES beat Victim 1 so severely that KIERSTEN arranged for Victim 1 to go with a high paying regular customer, Adrian Morin, because Victim 1 was too beat up to engage in prostitution dates with new customers. Trial Tr. Day 2 at 170; Trial Tr. Day 4 (Morin Testimony) at 134-135. Morin had arranged with KIERSTEN for a flat-fee arrangement of $1,000 per week for two prostitution dates with Victim 1. Exs. 11.01, 14.01; Trial Tr. Day 2 at 169; Trial Tr. Day 4 (Morin Testimony) at 123-124, 127-128. Morin paid this money starting on April 5, 2022, and continued through May 22, 2025. Exs. 11.01, 14.01, 15; Trial Tr. Day 4 (Morin Testimony) at 124. Morin also paid for other household expenses including a stove, phones, and miscellaneous items. Exs. 11.01, 14.01, 15; Trial Tr. Day 4 (Morin Testimony) at 129-

130. Morin paid all money directly to KIERSTEN's CashApp and Venmo accounts. Exs. 11.01, 14.01, 15. Trial Tr. Day 2 at 169; Trial Tr. Day 4 (Morin Testimony) at 125.

On May 22, 2022, KIERSTEN asked Morin to come to 64 Everard Street to pick up Victim 1, and because of Victim 1's injuries, asked Morin to take her directly to a hotel room. Trial Tr. Day 2 at 170-171; Trial Tr. Day 4 (Morin Testimony) at 134-135. When Morin arrived at 64 Everard Street, he witnessed KIERSTEN count out a certain number of Percocet pills for Victim 1 to take with her. Trial Tr. Day 2 at 172; Trial Tr. Day 4 (Morin Testimony) at 137-138. Morin observed injuries to Victim 1's face. Trial Tr. Day 4 (Morin Testimony) at 136. Morin took Victim 1 to the hotel room and Victim 1 explained that MOISES had caused her injuries and that she did not want to return to KIERSTEN or MOISES because she was scared of them. *Id.* (Morin Testimony) at 138, 141, 146. Darrach had seen Victim 1 the day previously and also noticed her injuries. Exs. 60-69. Trial Tr. Day 4 (Darrach Testimony) at 80-83. Morin flushed the drugs and assisted Victim 1 with detoxing. Trial Tr. Day 2 at 172; Trial Tr. Day 4 (Morin Testimony) at 144. KIERSTEN and MOISES repeatedly threatened Morin when they learned that Victim 1 was not going to return. Ex. 11.01; Trial Tr. Day 4 (Morin Testimony) at 148-149. Morin felt so threatened that he moved Victim 1 and himself to a different hotel in Marlborough. Trial Tr. Day 4 (Morin Testimony) at 150; Trial Tr. Day 5 (Levenson Testimony) at 83-84. A police officer who saw the text messages from MOISES to Morin noted that the texts appeared threatening and harassing. Trial Tr. Day 5 (Levenson Testimony) at 88-89.

KIERSTEN and MOISES then called multiple police departments to ask for well-being checks for Victim 1 in an attempt to have Victim 1 brought back to their apartment. Trial Tr. Day 2 at 172-173. KIERSTEN and MOISES called the police department in Morin's hometown and alleged that Morin was trafficking Victim 1 and that Victim 1 was a missing person. KIERSTEN

10

and MOISES continued to threaten Morin, sent him a photo of his house, and threatened his wife in an attempt to force him to bring Victim 1 back to their apartment. Trial Tr. Day 4 (Morin Testimony) at 148-149. KIERSTEN and MOISES convinced a family member to file a Section 35 petition to have Victim 1 involuntarily committed. Trial Tr. Day 2 at 173; Trial Tr. Day 5 (Levenson Testimony) at 82. The police brought Victim 1 to the courthouse for a hearing on the petition, and she was released. Trial Tr. Day 2 at 173-174; Trial Tr. Day 4 (Morin Testimony) at 151, 154. During this interaction, the police observed and recorded bruises on Victim 1. Exs. 41, 43-47, 50.

*Count Three – Interstate Transportation to Promote Prostitution – KIERSTEN only*

KIERSTEN used Seeking to set up prostitution dates for Victim 1. Trial Tr. Day 2 at 66. Subsequently, KIERSTEN used her phone to communicate the specifics of the prostitution date with the customer. Exs. 3.03, 29, 30; Trial Tr. Day 2 at 67, 69, 71, 87, 104-105, 109, 118; Trial Tr. Day 4 (Darrach and Morin Testimony) at 56-57, 125, 133. At trial, Darrach testified that KIERSTEN organized prostitution dates in Massachusetts, Connecticut, Rhode Island, and New Hampshire for Victim 1. Trial Tr. Day 4 (Darrach Testimony) at 35, 37. Then, KIERSTEN directed Darrach to drive Victim 1 across state lines to engage in prostitution. *Id.* (Darrach Testimony). Darrach did as instructed and drove Victim 1 to multiple states for the prostitution dates arranged by KIERSTEN. *Id.* (Darrach Testimony).

**PROCEDURAL HISTORY**

On December 15, 2022, a federal grand jury returned an indictment charging both defendants with one count of conspiracy to commit sex trafficking, in violation of 18 U.S.C. § 1594(c), and one count of sex trafficking by force, fraud, and coercion, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(1). Additionally, the grand jury charged KIERSTEN with one count of interstate

11

travel and transportation to promote unlawful activity, in violation of 18 U.S.C. § 1952(a)(3). Docket No. 1. The defendants' jury trial began on September 15, 2025. Docket No. 249. On September 22, 2025, the jury returned guilty verdicts on all charged counts against both defendants. Docket Nos. 256-57. The Judge scheduled the sentencing hearings for both defendants for December 16, 2025. Docket Nos. 258-259. On December 12, 2025, the Judge continued the sentencing hearings to January 23, 2026. Docket Nos. 274-75.

**SENTENCING HEARING**

The Presentence Reports ("PSR") prepared by the United States Probation Office ("USPO") found that the defendants' base offense level for the most serious charge, sex trafficking by force, fraud, and coercion was 34. MOISES PSR ¶ 28; KIERSTEN PSR ¶ 30. The USPO increased the defendants' offense level by two because Victim 1 was a "vulnerable victim" under USSG § 3A1.1(b)(1). MOISES PSR ¶ 30; KIERSTEN PSR ¶ 34. The defendants did not accept responsibility for their crimes and received no decrease under USSG § 3E1.1. MOISES PSR ¶ 35; KIERSTEN PSR ¶ 37. Each defendant had a total offense level of 36. MOISES PSR ¶ 36; KIERSTEN PSR ¶ 38. Neither defendant had any criminal history, and therefore, both defendants were in Criminal History Category I. MOISES PSR ¶¶ 40-41; KIERSTEN PSR ¶¶ 42-43. For Count One, the defendants' mandatory minimum term of imprisonment was 15 years. MOISES PSR ¶ 97; KIERSTEN PSR ¶ 112. Given the resulting total offense level and criminal history, the defendants' GSR was 188 – 235 months and five years to life of supervised release. MOISES PSR ¶¶ 98, 102; KIERSTEN PSR ¶¶ 113, 117.

The government agreed with the USPO's calculation of total offense level, criminal history, and GSR. KIERSTEN objected to numerous factual statements in the PSR in order to preserve her appellate rights and objected to the overall GSR. KIERSTEN PSR at 32-35. MOISES

objected to several factual statements in the PSR and to the application of the two-level vulnerable victim enhancement under USSG § 3A1.1(b)(1).  MOISES PSR at 28-29.  The USPO found the two-level enhancement was warranted and the GSR was properly calculated.  *Id.*; KIERSTEN PSR at 32-35.  Prior to the sentencing hearings, the government and both defendants submitted sentencing memoranda and MOISES submitted a further objection to the USPO's determination that a vulnerable victim enhancement was warranted.  Docket Nos. 270-272 (sentencing memoranda); 278 (MOISES objection).

At the sentencing hearing, the Judge heard argument regarding the vulnerable victim enhancement from MOISES, Sentencing Tr. at 15-17, and the government, *id.* at 17-19. KIERSTEN joined in the objection.  *Id.* at 19.  The Judge ruled that the vulnerable victim enhancement was appropriately applied in this case.  *Id.*  The Judge overruled all other objections or found that she did not need to rule on the remaining objections under Federal Rule of Criminal Procedure 32.  *Id.* at 11, 14, 26-27.  The Judge accepted the factual statements contained in both defendants' PSRs.  *Id.* 20, 27.  The Judge then calculated the defendants' base offense levels as 36 and found the applicable GSR for both defendants to be 188 – 235 months.  *Id.*

During the sentencing hearing, to give both defendants an opportunity to confer with their counsel, the Judge took a 10-minute break.  *Id.* at 22-23.  During this break, one of the Judge's interns or clerks approached AUSA Cummings with an envelope.  The intern stated that it was from the Judge and was for the victim.  AUSA Cummings did not open the envelope and did not know its contents.  AUSA Cummings handed the envelope to the case agent.  AUSA Cummings

then informed the undersigned that she had been handed the envelope.  The sentencing hearing then resumed.

The Judge then heard argument from MOISES, in which counsel argued for a sentence of 15 years' incarceration, the applicable mandatory-minimum sentence.  *Id.*  The government then argued for a sentence of 18 years' incarceration.  *Id.* at 33-39.  MOISES declined to address the Judge.  *Id.* at 39.  The Judge heard argument from KIERSTEN, in which counsel argued for a sentence of 15 years' incarceration.  *Id.* at 39-46.  The government then argued for an 18-year sentence.  *Id.* at 46-50.  KIERSTEN also declined to address the Judge.  *Id.* at 51.

The Judge then imposed sentence on each defendant starting with MOISES.  The Judge noted the extreme physical violence MOISES had used to coerce Victim 1 during the trafficking period: "When Kiersten Soto coerced the victim under the threat of violence from Moises, Moises delivered. On one occasion, Kiersten threatened the victim that Moises would give her two black eyes, and, indeed, within days the victim sustained a beating from Mr. Soto. This pattern repeated over and over for months."  *Id.* at 53.  The Judge imposed a within-guideline sentence of 18 years' incarceration (216 months).  *Id.* at 54.

The Judge moved onto KIERSTEN next.  The Judge noted that KIERSTEN was the brains of the sex-trafficking operation and controlled every aspect of Victim 1's life: "While Mr. Soto was the muscle of the scheme, Kiersten Soto was the mastermind. She decided who the victim should go on dates with, told the victim what to say to the Johns, coordinated logistics of the dates, and carefully controlled nearly every aspect of the victim's daily life.  Particularly horrifying in the testimony of the complainant was a fear that in many of these dates the victim was going to have to engage in sexual acts that physically harmed her, that she did not wish to engage in, that put her at greater physical risk; and she did this because Kiersten negotiated for a higher fee."  *Id.*

at 55.  The Judge also expressed sympathy for KIERSTEN for the traumatic upbringing she had and her struggles with mental health conditions and substance abuse: "I know that Kiersten Soto's life has been very difficult. Traumatic. Orwellian in some cases . . . I believe that you are broken as well. And I think that many of the actions that you took may have been enhanced by medical conditions, mental health conditions that you have, perhaps domestic abuse." *Id.* at 56-57.  The Judge imposed an in-guideline sentence of 18 years' incarceration (216 months). *Id.* at 57.

After the sentencing hearing, the undersigned AUSA opened the envelope.  It contained a card with a message in it from the Judge along with a bracelet and several seashells.  Docket No. 286-4.  In the card, the Judge included a message: "Every important journey in life starts with the 1st step.  You have shown great courage in your own journey to reclaim your life and your future. I wish you much joy, love, and happiness, and peace."  Docket No. 286-4 at 1. On January 28, 2026, the undersigned AUSA disclosed the facts relating to the envelope and its contents to defense counsel via email.  Docket No. 286-3.  The following day, after obtaining the envelope from the case agent, the undersigned AUSA provided photos of the card, bracelet and seashells to defense counsel.  The envelope and its contents are still in the possession of the undersigned AUSA and have not been provided to Victim 1.

### LEGAL STANDARD

"The remedy of a new trial must be used sparingly, and only where a miscarriage of justice would otherwise result." *United States v. Conley*, 249 F.3d 38, 45 (1st Cir. 2001); *see also United States v. Borda*, 786 F. Supp. 2d 25, 31 (D.D.C. 2011) ("Motions for a new trial are not favored and are reviewed with great caution.") (internal citations and quotation marks omitted).  To prevail on a Rule 33 motion on the basis of newly discovered evidence, a defendant must make a four-part showing: "(1) the evidence was unknown or unavailable to the defendant at the time of trial;

(2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of the defendant."[4] *See United States* v. *Rodriguez-Marrero*, 390 F.3d 1, 14, 28 (1st Cir. 2004) (quoting *United States* v. *Wright*, 625 F.2d 1017, 1019 (1st Cir. 1980)); *United States* v. *Alicea*, 205 F.3d 480, 487 (1st Cir. 2000). This First Circuit standard is commonly known as the "*Wright* standard" or the "*Wright* test." *See United States v. Martínez-Mercado*, 919 F.3d 91, 105 (1st Cir. 2019); *United States v. Maldonado-Rivera*, 489 F.3d 60, 66 (1st Cir. 2007). "The defendant must meet all four prongs of the *Wright* test in order to succeed on a Rule 33 motion. A defendant's new trial motion *must* be denied if he fails to meet any one of these factors." *Rodriguez-Marrero*, 390 F.3d at 14 (emphasis added) (quoting *United States v. Colon–Munoz,* 318 F.3d 348, 360 (1st Cir. 2003)). The *Wright* standard imposes "a heavy burden for any defendant." *United States v. Rivera-Carrasquillo*, 933 F.3d 33, 53 (1st Cir. 2019); *United States v. Hernández-Rodríguez*, 443 F.3d 138, 143 (1st Cir. 2006). Evidence is material when "it has the potential 'to alter the outcome of the lawsuit under applicable legal tenets.'" *Hernández-Rodríguez*, 443 F.3d at 145 (quoting *Roche v. John Hancock Mut. Life Ins. Co*., 81 F.3d 249, 253 (1st Cir. 1996)).

**ARGUMENT**

Here, the defendants cannot meet their heavy burden under the *Wright* standard. First, the Judge's expression of sympathy for Victim 1 at sentencing, who had been brutalized, beaten, trafficked, and terrorized by the defendants who had already been found guilty at trial, is insufficient to show judicial bias at trial. Even if this Court were to find the newly discovered evidence showed bias, that bias occurred *four months after* the defendants had been convicted of

---

[4] Because the newly discovered evidence arose four months after the defendants were convicted at trial, the government does not dispute that the defendants have satisfied their burden for first two prongs of the *Wright* standard.

all counts by a unanimous jury, and the defendants offer no support or authority for the proposition that any bias at sentencing was present during the trial or in any pretrial proceeding. Second, the Judge's rulings excluding the purported impeachment evidence during trial were correct under the Rules of Evidence and applicable case law. Simply because the defendants disagreed with the Judge's evidentiary rulings, they cannot show that these rulings during trial were somehow infected with bias. Finally, even if this Court accepts the defendants' allegations that the Judge was biased and that the evidentiary rulings were incorrect, the evidence the Judge excluded at trial was for impeachment of Victim 1 and not material to the guilt or innocence of the defendants and its admission would not have resulted in a different result at trial. For all these reasons, Defendant's Motion for a New Trial should be denied.

## I.      The Defendants Have Failed to Show Judicial Bias

Defendants cannot bear their burden under the *Wright* standard to show that the newly discovered evidence from the sentencing hearing proves judicial bias sufficient to vacate the jury's verdict at trial. The communication from the Judge was made during the sentencing hearing on January 23, 2026, more than four months after the jury had found both defendants guilty of sex trafficking crimes. At the time the Judge provided the note to the government to provide it to Victim 1, the defendants' guilt was established and Victim 1's status as a victim under the Crime Victim Rights Act, 18 U.S.C. § 3771(e)(2)(A) (the "CVRA"), was not in dispute. In her note to Victim 1, the Judge directed her message solely toward the victim and did not express any opinion regarding the defendants' criminal conduct or the government's case. Given the timing of the message and its contents, the defendants cannot make a sufficient showing of bias required to overturn the jury's verdict.

"There is a strong presumption in the law that, in performing their official duties, judges act with honesty and integrity and are capable of overcoming biasing influences and rendering evenhanded justice." *United States v. Riego*, 645 F. Supp. 3d 1203, 1223 (D.N.M. 2022). The First Circuit has held that there is a "presumption that a judge will impartially apply the law, as required by his or her oath." *In re United States*, 158 F.3d 26, 34 (1st Cir. 1998); *United States v. Sampson*, 148 F. Supp. 3d 75, 79 (D. Mass. 2015). "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455 (a). Under *Liteky v. United States*, a judge's predisposition towards a litigant must be "wrongful or inappropriate" in order to meet the definition of partiality under section 28 U.S.C. 455(a) and further that "under [section] 455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility[,] or disposition of a kind that a fair-minded person could not set aside when judging the dispute." 510 U.S. 540, 552, 558 (1994).[5] Importantly, section 455 provides the standard for recusal, not for a new trial based on purported bias.

"Opinions based on facts or events occurring in a judicial proceeding 'do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *United States v. Minard*, 856 F.3d 555, 557 (8th Cir. 2017) (quoting *Liteky*, 510 U.S. at 555). "Rules against 'bias' and 'partiality' can never mean to require the total absence of preconception, predispositions and other mental habits." *United States v. Johnson*, 163 F.4th 518, 523 (8th Cir. 2026).

---

[5] Judge Guzman has already recused herself from further proceedings in this case, Docket No. 287, and therefore, the issue before the Court is no longer recusal, but the appropriateness of granting a new trial.

Courts have consistently held that sympathetic gestures toward a victim do not, by themselves, demonstrate judicial bias against a defendant. *See, Johnson*, 163 F.4th at 523 (rejecting a challenge to sentencing based on purported judicial bias and finding "Judge Menendez's comments, directed to a young victim struggling to express the impact of the horrible abuse he had endured, understandably expressed sympathy -- and empathy -- for enduring the physical and emotional harm caused by the defendant's crime"); *Minard*, 856 F.3d at 557 (rejecting a challenge to sentencing and motion for recusal based on a claim of judicial bias and holding that "the district court's spontaneous expression of empathy for a crime victim's impact statement reflected no deep-seated antagonism"); *Prophet v. United States*, No. 14-00047-01-CR-W-DGK, 2016 WL 8928311, at \*6 (W.D. Mo. Oct. 20, 2016) (denying section 2255 motion to vacate based on a claim of judicial bias and ruling the "remarks of which Movant complains were mere expressions of sympathy for Movant's victim"); *Preston v. Lattimer*, No. C 09-02262 WHA, 2011 WL 1748371, at \*9 (N.D. Cal. May 6, 2011) (denying section 2255 motion to vacate conviction where the judge "merely expressed sympathy for the many parties who would be inconvenienced by his ruling," including the families and friends of the victim); *Ryan v. Clarke*, 281 F. Supp. 2d 1008, 1034 (D. Neb. 2003), *aff'd*, 387 F.3d 785 (8th Cir. 2004) (denying section 2255 motion to vacate death sentence where judge met *ex parte* with murder victims' family members prior to sentencing defendant to death and ruling "there was no federal constitutional error . . . the meetings between Judge Finn and the family members of the victims established no 'structural error' where bias must be presumed, and they evidenced no actual bias either"); *cf. Miller v. Webb*, 385 F.3d 666, 680 (6th Cir. 2004) (J. Gibbons, dissenting) ("Expressions of sympathy for a victim, without more, do not demonstrate actual bias where the juror has assured the court that she may decide the case fairly.").

In *Johnson*, after hearing the victim's impact statement, the district judge addressed the victim directly:

> There is something I want to say to you, and it is that I think you might be the strongest person I have ever come across. And I have been involved in the criminal justice system for a really long time, so I've seen some tough people. But it takes extraordinary strength to survive what you survived, and it takes a lot of strength to keep on surviving. And I am so, so glad that you did. I'm so glad that you held on. And I am really grateful to your foster family, that you landed somewhere wonderful, because I think that we are going to see every day a little bit more the kind and sweet kid that is inside of you that's already come out.
>
> One of the things that I am most struck by in the things that I've learned about you, and I've learned a lot, is the compassion that you show to other people. It's something that they talked about at Evergreen [youth shelter]. It's something that the FBI agent talked about. It's something that your family talked about. And it's something that's clear to me when you talk about how much you worry about your niece and nephew.
>
> One of the things that I've thought a lot about is that you weren't just fragile when you got to Evergreen. You were fragile when you got to Trina's house too. You had already been through more in your almost 12 years than anybody should, and that child deserved love and care and protection. That child was already struggling with a lot of stuff that you'd already been through. And it's heartbreaking that that didn't happen for you until now.
>
> And the last thing I want to say is that I think I understand that your sister has passed away also? ... And I'm really sorry about that. But I know that -- I know that she and everybody else in your family, whether they're here or not, is proud of you today. And I just wanted you to hear that from me.

163 F.4th at 521. Despite the judge's detailed statement of sympathy for the crime victim at sentencing, the Eighth Circuit held, "Judge Menendez's statements at sentencing fall far short of this high bar for establishing bias." *Id.* at 523. Here, Victim 1 could not be present at sentencing, and so the provision of the note to the government was the Judge's attempt to provide that statement to the absent victim, an impulse encouraged by the CVRA. *Id.* ("A judge's impromptu statement to a victim does not demonstrate bias toward the defendant; rather, it furthers the congressional policy of encouraging crime victim participation in the criminal justice process.")

(internal alterations and quotation marks omitted); *see also Minard*, 856 F.3d at 557 ("Rather than reflect bias or antagonism to [Defendant], the district court's single statement—directed to the crime victim at the end of the victim's stressful appearance—furthered the congressional policy of encouraging crime victim participation in the criminal justice process.").

In *State v. Salsbury*, the defendant pled guilty to five felonies related to the sexual abuse of four children. 2013 WI App. 30, ¶ 2 (WI App. 2013). At sentencing, the trial judge spoke directly to one of the child victims, expressed sympathy, provided a notepad and pen to write down some of the trial judge's comments, and gifted the child victim a children's book. *Id.* at ¶ 7. The trial court then sentenced the defendant to 34 years in prison. *Id.* at ¶ 11. Based on the comments to the victim, the defendant moved for resentencing, which was denied. *Id.* at ¶ 13. At the hearing on the defendant's motion for a new sentencing, the trial court stated: "This was a sentencing hearing. It wasn't an initial appearance. It wasn't a preliminary hearing. It wasn't a jury trial. And it wasn't a plea. This man on that date was in a court that I presided over for sentencing. There's no presumption of innocence.... It's a fact of guilt." *Id.* at ¶ 13. In affirming the denial of the defendant's motion for a new sentencing, the Court of Appeals of Wisconsin rejected the defendant's argument that "that the mere act of a court giving gifts to the victim of a crime during a sentencing hearing establishes by a preponderance of the evidence that the court was not impartial." *Id.* at ¶ 26 ("As the trial court explained, it offered the children's book and pen as a means of encouraging the victim to move forward with her life, despite the suffering she endured as a result of [the defendant's] admitted crimes against her."). The Court of Appeals found that the defendant had not shown either objective or subjective judicial bias and found "the trial court's acknowledgement of the victim's suffering and its encouraging words were not unfair to [the defendant]." *Id.* at ¶ 25.

Similarly, here, the defendants cannot show that the expressions of sympathy to Victim 1 provided to the government at the sentencing showed bias against the defendants. The note from the judge expressed no opinion about the defendants or the government. It was a pure expression of sympathy and hope for Victim 1: "Every important journey in life starts with the 1st step. You have shown great courage in your own journey to reclaim your life and your future. I wish you much joy, love, and happiness, and peace." Docket No. 286-4 at 1. This expression is far shorter than the expression from the judge in *Johnson*. Just like the expressions of sympathy in *Johnson* and *Minard*, here, the Judge expressed no opinion about the defendants. The Judge made no comment on Victim 1's trial testimony. The Judge made no mention of penalties or punishment for the defendants. The Judge did not comment on the worthiness or strength of the government's case. Rather, the Judge "understandably expressed sympathy -- and empathy -- for enduring the physical and emotional harm caused by the defendant's crime." *Johnson*, 163 F.4th at 523. Had Victim 1 been present at the sentencing hearing, the Judge could have said the words from her note directly to Victim 1.

Similarly, the provision of the seashells and small bracelet, like the children's book in *Salsbury*, were expressions of sympathy and hope and do not show any bias against the defendants. Significantly, the Judge expressed sympathy at the sentencing hearing for KIERSTEN as well. *See* Sentencing Tr. at 56-57 ("I know that Kiersten Soto's life has been very difficult. Traumatic. Orwellian in some cases . . . I believe that you are broken as well. And I think that many of the actions that you took may have been enhanced by medical conditions, mental health conditions that you have, perhaps domestic abuse."). In taking into account all the information before her at sentencing, the Judge expressed sympathy for KIERSTEN's life circumstances.

Simply put, crime victims should be encouraged to come forward and participate in the criminal justice process and judicial expressions of sympathy at sentencing hearings do just that. The government has agreed to resentencing out of an abundance of caution given the Judge's method of conveying her sympathy in the form of a note to the victim given to the government. But no more is required. Expressions of sympathy to a proven victim of a defendant's crime do not show bias, and the Defendants' Motion should be denied on this basis alone. Even if there were bias or the appearance of bias *at sentencing*, however, the defendants provide no basis for concluding that this purported bias affected *the trial* that concluded four months prior, as discussed below.

## II. Even if Defendants' Could Show Bias at Sentencing, the Newly Discovered Evidence is Insufficient to Grant a New Trial Under the Demanding *Wright* Standard.

In addition to failing to show actual judicial bias, the defendants have several additional fatal flaws in their argument. For the Court to order a new trial, the defendants cannot simply rely on the newly discovered evidence, because the provision of the sympathy note occurred four months after trial. Similarly, the evidentiary rulings at trial now challenged by the defendants are insufficient in themselves to show bias sufficient to overturn the jury's verdict. *United States v. Medoff*, 159 F.4th 107, 123 (1st Cir. 2025) ("As a threshold matter, as the Supreme Court explained in *Liteky*, 'judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.'") (quoting *Liteky*, 510 U.S. at 554). Therefore, to succeed in their Motion for a new trial, the defendants must connect the purported bias at sentencing to the disputed evidentiary rulings at trial four months before and show that the evidentiary rulings were erroneous and infected by judicial bias. The Government is unable to find any case law supporting a finding of judicial bias imputed *back* to prior proceedings. Biased statements may be imputed toward subsequent

proceedings, although not necessarily, but not backwards in time to prior proceedings. *See United States v. Kelley*, 712 F.2d 884, 890 (1st Cir. 1983) (citing *United States v. Mirkin,* 649 F.2d 78 (1st Cir.1981) ("[E]ven when a judge has made a negative determination regarding a party's credibility in a prior proceeding, the judge is not required to recuse himself from presiding at a subsequent proceeding involving the same party."). Therefore, attributing a purported, isolated instance of bias to *earlier* proceedings would establish a novel and unwarranted precedent that would risk upending prior judicial determinations without an adequate showing of bias. That is a wide chasm the defendants cannot bridge. *See Aggarwal v. Ponce Sch. of Med.*, 837 F.2d 17, 22 (1st Cir. 1988) ("To sustain a charge of improper conduct, however, the reviewing court must find that a party was so seriously prejudiced as to be deprived of a fair trial.").

The defendants have offered no support for the proposition that an instance of purported bias at sentencing necessarily affected the Judge's trial rulings, but even if they could, that showing would be insufficient. The defendants still have failed to show that (1) the rulings were incorrect as a matter of law, and (2) that even if the Judge had admitted the disputed impeachment evidence, that the evidence would have made any difference to the outcome of the trial. Because they cannot bear their heavy burden under the *Wright* standard, Defendant's Motion fails.

### a. The Judge's Evidentiary Rulings at Trial Were Correct as a Matter of Law.

The Judge's rulings excluding the purported impeachment evidence during trial were correct under the Rules of Evidence and applicable case law. Simply because the defendants disagreed with the Judge's evidentiary rulings, they cannot show that these rulings during trial were somehow infected with bias. Given the correctness of the Judge's evidentiary rulings and the lack of materiality of the evidence, the defendants cannot show they were deprived of a fair trial.

24

i. <u>Victim 1's Pending State Drug Charges Were Properly Excluded from Cross Examination.</u>

The defendants argue that they should have been allowed to cross-examine Victim 1 about unrelated pending state drug charges to show bias towards the federal government. Defendant's Motion at 2-3. Pretrial, the government moved *in limine* to exclude cross-examination about pending drug charges against Victim 1 in Worcester District Court. The charges included a default and outstanding warrant for Victim 1's arrest. Docket No. 245. At the beginning of Day 2 of the jury trial, the Judge heard argument from counsel and excluded evidence related to the state charges. Trial Tr. Day 2 at 5-7. MOISES filed a motion for reconsideration, Docket No. 251, and the government opposed, Docket No. 252. At the beginning of Day 3 of the jury trial, the Judge heard renewed argument on the issue and denied MOISES's motion for reconsideration. Trial Tr. Day 3 at 6-12. The Judge found that the state charges were irrelevant, unduly prejudicial, and that the defendant's motions on this issue were untimely filed. *Id.* at 10-11. The Judge was correct.

Given the timeline of when Victim 1 reported the sex trafficking by the defendants to investigators and testified about these crimes under oath before the Grand Jury (October 13, 2022), the much-later July 2025 charges had no bearing on her credibility. The two cases cited by the defendant in his motion for reconsideration were inapposite given the timing of those witnesses' willingness to speak with investigators about the crimes at issue.[6] In *Davis v. Alaska*, when the witness spoke with police, he was already on probation with the juvenile court and therefore, may have had a motive to curry favor with investigators in the initial interviews. *See* 415 U.S. 308,

---

[6] *Olden v. Kentucky*, the third case cited by the defendant, Defendant's Motion to Admit Pending State Charges at 3, involved the preclusion of questioning about the witness's cohabitation with a person of a different race. 488 U.S. 227, 230 (1988).

310–11 (1974) ("At the time of the trial *and at the time of the events Green testified to*, Green was on probation by order of a juvenile court after having been adjudicated a delinquent for burglarizing two cabins.") (emphasis added).  Here, there were no pending charges at the time of Victim 1's disclosures to investigators or her grand jury testimony.  In *Delaware v. Van Arsdall*, after the witness agreed to speak with the prosecutor, his state charges were dismissed.  *See* 475 U.S. 673, 676 (1986) ("During Fleetwood's cross-examination, defense counsel sought to impeach Fleetwood by questioning him about the dismissal of a criminal charge against him—being drunk on a highway—*after he had agreed to speak with the prosecutor* about Epps' murder.") (emphasis added).  Here, Victim 1's state charges remained pending through trial.  The government has taken no steps to have these charges dismissed by the state prosecutors.  In other words, the timing of the charges matters.  Here, *years before the state charges were filed*, Victim 1 agreed to speak with investigators and prosecutors about the defendants' criminal conduct, including providing sworn grand jury testimony without any promises, inducements, or immunity.  The timing of her interviews and grand jury testimony puts the present case far outside the timeline where these July 2025 pending criminal charges could be relevant to show bias.

Additionally, in the cases cited by the defendant, the pending charges against the witnesses were lodged by state prosecutors, and state prosecutors brought the criminal charges against the defendants who went to trial.  Here, Victim 1's charges were brought by the Commonwealth of Massachusetts, whereas the crimes against the defendants were being prosecuted by the federal government.  The federal government, a separate sovereign, had no ability to control the ultimate disposition of Victim 1's state charges and had no agreement with Victim 1 to assist her in the ultimate resolution of those charges.  Therefore, there was no basis to claim that Victim 1 had an incentive to curry favor based on those state charges.  *See Stephens v. Hall*, 294 F.3d 210, 224 (1st

Cir. 2002) (observing that a suggestion of bias would be "rather weak" against a prosecutor's witness who had pending charges in a different county and that the witness's testimony was "not likely to win [her] points" with a prosecutor from a different county).

Finally, the defendants stretch their argument past bias and argue that because the state charges may have involved the defendants' and Victim 1's drug dealer from the trafficking period, they needed to explore the continuing relationship between Victim 1 and that drug dealer. Defendant's Motion at 3. Why? The defendant's claim that information would be relevant to Victim 1's credibility. How? During her testimony, Victim 1 admitted that at the direction of the defendants, she obtained drugs from the dealer and had a prior relationship with that dealer. Trial Tr. Day 2 at 121-122, 128-30, 142-144, 183-186. The Judge admitted numerous exhibits showing communications between the defendants and the drug dealer in which the defendants admitted sending Victim 1 to pick up drugs from the dealer. Exs. 8.01 – 8.05. There was no dispute among the parties that both defendants and Victim 1 obtained drugs from the drug dealer at issue and all three individuals used those drugs. Given that, it is unclear why inquiry into the current relationship between Victim 1 and that drug dealer would have any relevance to either Victim 1's credibility, or any disputed issues of fact. For all these reasons, the evidence of Victim 1's pending state charges was properly excluded at trial.

<div align="right">

ii. <u>The Judge Properly Excluded Additional Questioning About Whether Victim 1 May Have Been Under the Influence During Her Testimony.</u>

</div>

The defendants argue that they should have been allowed to cross-examine Victim 1 about whether she was under the influence of opioids during her testimony. Defendant's Motion at 3. However, they ignore the fact that counsel did question Victim 1 about her physical state, extensively questioned her about opioid withdrawals, and asked her point blank whether she was currently going through opioid withdrawals. Victim 1 answered counsel's questions, and the jury

heard those answers. Trial Tr. Day 2 at 180-83. Therefore, any additional evidence would have been cumulative and of such little probative value that its value would have been substantially outweighed by the danger of unfair prejudice, confusion of the issues, undue delay, and have been needlessly cumulative. *See* Fed. R. Evid. 403.

Counsel for KIERSTEN asked Victim 1 numerous questions about opioid withdrawal symptoms, Trial Tr., Day 2 at 180-81, and then asked Victim 1 whether she had "vomited today." Victim 1, responded, "Today?" and counsel confirmed. Victim 1 then responded, "Yes. I'm pregnant." *Id.* at 181. Then counsel asked, "When is the last time you went through withdrawal symptoms?" Victim 1 responded, "Since May," and then the government objected. The objection was sustained, but Victim 1's answer was not stricken from the record. Based on counsel's lengthy questioning about opioid withdrawal symptoms followed by questions about whether Victim 1 was currently suffering from those withdrawal symptoms, there is no doubt the jury understood the import of those questions and answers. Further, when defense counsel asked her about the last time she suffered from those symptoms, she responded, "Since May." That was the answer. She was physically sick because she was pregnant and had last suffered from opioid withdrawal symptoms in May. The trial was in September.

Moreover, to the extent defense counsel wanted to explore Victim 1's struggles with addiction and withdrawals for the purpose of impeaching her memory and perception, those issues had already been extensively discussed during opening statements and inquired upon in witness examination. Trial Tr. Day 2 at 25, 27-28, 31-38, 41, 43, 44, 47, 59, 66, 80, 100-103, 106, 115, 119, 121-22, 127-31, 141, 143-44, 159-60, 163-65, 170, 174. To add to the inquiry about addiction and withdrawal, counsel for KIERSTEN asked Victim 1, "[Victim 1] have you ever said or done anything deceptive while going through withdrawal symptoms in an effort to get the withdrawal

28

symptoms to be alleviated?" Victim 1 replied, "Yes." *Id.* at 183. At that point, it seems clear that counsel had gotten the admission from Victim 1 he sought. He had gotten more than enough evidence from Victim 1 that she was physically sick while testifying. Moreover, to the extent that counsel wanted to impeach Victim 1 on her memory or perception of events, he could make full use of the fact that Victim 1 was using drugs during the trafficking period and inquire about any prior inconsistent statements through the use of Victim 1's grand jury testimony.

Given the extensive discussion and admissions by Victim 1 that she suffered from opioid addiction, and the admission that she had used deception to avoid withdrawal symptoms in the past, it is unclear what additional questions about her current physical state would have surfaced in this trial. The Judge appropriately precluded further inquiry into this topic. *See Kunz v. DeFelice*, 538 F.3d 667, 676-77 (7th Cir. 2008) (citing *United States v. Cameron,* 814 F.2d 403, 405 (7th Cir. 1987)) ( "…There is considerable danger that evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony. . . . A court must, therefore, be chary in admitting such evidence when it is offered for the sole purpose of making a general character attack."); *United States v. Kearney*, 420 F.2d 170, 173-174 (D.C. Circuit 1969) ("There is an interest in avoiding undue evidentiary assault on prosecution witnesses. Prejudice may result if questions asked for the limited purpose of testing, say, opportunity to observe, are permitted to generate a hostility based on the general odium of narcotics use."). The court may bar cross-examination about a witness' illegal drug use when it is used **"**for the sole purpose of making a general character attack**"** and may admit the evidence as it relates to the witnesses' "possible inability to recollect and relate." *Cameron,* 814 F.2d at 405. Victim 1 had already admitted to prior drug use numerous times, so further questioning would only serve as a general character attack. Since this evidence would have had next to no probative value, and any

marginal value would have been substantially outweighed by the issues Fed. R. Evid. 403 seeks to avoid, the Judge properly excluded additional questioning about Victim's 1's drug use.[7]

### b. The Excluded Evidence Was Solely for the Basis of Impeachment and Not Material to Guilt or Innocence under the *Wright* Standard.

Even if this Court were to determine that the Judge exhibited bias at trial based on newly discovered evidence at sentencing four months later, and even if the Court were to rule that the impeachment evidence should have been admitted, the defendants still cannot bear their burden under *Wright* standard to show that this impeachment evidence was material or its admission would have probably resulted in an acquittal at trial. Defendant's Motion should be denied.

"Evidence that is cumulative or of marginal relevance ordinarily is insufficient to satisfy the third requirement of the *Wright* standard. So too evidence that is merely impeaching." *Maldonado-Rivera*, 489 F.3d at 70 (internal citations omitted); *see also United States v. Rodriguez*, 738 F.2d 13, 18 (1st Cir. 1984) ("Impeachment evidence is presumptively immaterial."); *Barrett v. United States*, 965 F.2d 1184, 1195 (1st Cir. 1992) ("Since it does not bear directly on the defendant's guilt or innocence, impeachment evidence does not rise to the level of materiality that would be likely to cause a different result at a new trial.") (cleaned up); *DeCologero v. United States*, 802 F.3d 155, 161 (1st Cir. 2015) (affirming that two FBI reports, which were not disclosed by the prosecution, were not material, as the evidence could not "reasonably be taken to put the

---

[7] The defendants also claimed that the Judge disallowed defense attempts to authenticate messages in which Victim 1 "admitted to fabricating allegations of sex trafficking against the Defendants." Defendant's Motion at 3. The government is unclear what document the defendants are referring to. However, to the extent these communications involved Victim 1 and the defendants or some other third party, they would constitute hearsay as they are out-of-court statements offered for the truth that Victim 1 had fabricated the allegations. Fed. R. Evid. 801(c). Moreover, the claim that Victim 1 fabricated allegations against the defendants is entirely contradicted by the weight of the evidence at this trial. Additionally, it is impossible to square a claim that Victim 1 fabricated allegations with the defendants' own statements in the Facebook video, Ex. 22.04, in which MOISES repeatedly threatened Victim 1 about not speaking with police while she was experiencing painful withdrawal symptoms: "Nah, you plan on fucking snitching on us?" "You tryna snitch on us?" "So what do you want to not snitch?" "Yeah you wanna sit there and fucking snitch on us." Given the weight of the evidence and the defendants' own recorded statements, admission of the statements containing purported falsifications by Victim 1 would hardly be material or result in an acquittal.

30

whole case in such a different light as to undermine confidence in the verdict" due to the strength of the corroboration from other physical evidence and witness testimony); *United States v. Laureano-Salgado*, 933 F.3d 20 (1st Cir. 2019) (finding that alleged new, exculpatory evidence regarding a gang murder "cannot be reasonably viewed as 'greatly undermining' the pertinent verdicts.'"). Evidence that is merely impeaching "normally cannot form the basis for a new trial." *Colón-Muñoz*, 318 F.3d at 361 (quoting *United States v. Bonadonna*, 775 F.2d 949, 957 (8th Cir. 1985)).

To warrant a new trial based on newly discovered evidence, a defendant must show that the evidence would likely result in an acquittal upon retrial. This probability must be assessed through "an objectively reasonable appraisal of the record as a whole, not on the basis of wishful thinking, rank conjecture, or unsupportable surmise." *United States v. George*, 448 F.3d 96, 101 (1st Cir. 2006) (quoting *United States v. Natanel*, 938 F.2d 302, 314 (1st Cir. 1991)); *United States v. Josleyn*, 206 F.3d 144, 157 (1st Cir. 2000) (The actual-probability-of-acquittal standard requires "an evaluation of the new evidence in juxtaposition to the evidence actually admitted at trial"). Based on the weight of the evidence introduced at trial, the defendant cannot show that the impeachment evidence, if admitted, would yield a different result under the *Wright* standard.

The defendants concede that the disputed evidence was for the purpose of impeaching Victim 1's credibility. Defendant's Motion at 3 (referring to the pending state drug charges as "this patently relevant issue involving the alleged victim's credibility"), at 3 (referring to allegations of current withdrawal symptoms), at 6 (referring to "the centrality of the alleged victim's credibility to the government's case"). The case law is clear on this point. "Impeachment evidence is presumptively immaterial." *Rodriguez*, 738 F.2d at 18. Assuming *arguendo* that all the defendants'

allegations of bias and lack of credibility against Victim 1 are true, the evidence is still not material to the defendants' guilt or innocence.

Given that, the defendants cannot show that the introduction of any or all of this impeachment evidence would have probably resulted in an acquittal of the defendants, and therefore, they are not entitled to a new trial. If the jury had heard that Victim 1 was under pending state drug charges from July 2025, then the government could have introduced Victim 1's prior consistent statements in grand jury and to investigators which occurred *before* she was charged in the state. *See* Fed. R. Evid. 801(d)(1)(B). If the jury had heard that Victim 1 had recently used drugs, it is difficult to understand how that fact would have affected her credibility given the dozens of references to Victim 1's use of drugs in openings, witnesses examinations (from Victim 1 and other witnesses), text messages, Facebook messages, and in closing arguments. Similarly, if the defendants had put in evidence that Victim 1 had recently received drugs from the same drug dealer she and the defendants bought drugs from in 2022, it is unclear what affect that fact would have on her credibility.

Finally, the defendants describe a very different trial than the one the jury saw. They need this Court to believe that the entire case rested solely on the testimony of Victim 1 such that one additional piece of impeachment evidence would have resulted in an acquittal. Undoubtedly, Victim 1 was an important witness at this trial. However, Victim 1's testimony did not stand alone. The government called Adrian Morin, one of the sex buyers who paid KIERSTEN for Victim 1's services and saw her physical injuries. The government called Brad Darrach who drove Victim 1 to prostitution dates across state lines and saw her drug abuse and heard and saw first-hand KIERSTEN and MOISES's threats and violence. The government called an expert witness on sex trafficking who described the business of trafficking and the methods of force and coercion

32

traffickers used. The government called Victim 1's childhood friend who saw how controlling MOISES was and testified about how scared Victim 1 was around him. In addition to these and other witnesses, the government put in evidence dozens of Facebook messages, text messages, photos, and other evidence corroborating witness testimony. These exhibits showed the jury in KIERSTEN's and MOISES's own words how they trafficked Victim 1, how they threatened, beat, withheld drugs, coerced, and terrorized her during this period. The government played a video where MOISES and KIERSTEN cornered Victim 1 and treated her like an animal while she was shaking with fear and drug withdrawals begging for drugs, all while KIERSTEN and MOISES threatened, demeaned, berated, and humiliated her. Given this evidence, the defendants cannot credibly claim that the introduction of one or two pieces of purported impeachment evidence against Victim 1 would have led to a different result at trial.

## CONCLUSION

The defendants have not shown any actual bias by the Judge, and any potential appearance of bias occurred four months after trial. The government has acceded to resentencing, but the defendants have failed to demonstrate that they are entitled to a new trial, as well. They provide no basis for concluding that any bias at sentencing affected the Judge's evidentiary rulings at trial. Moreover, the evidentiary rulings at trial were proper, and even if they were erroneous, the impeachment evidence was not material, and its admission would not have led to an acquittal at

trial. For all these reasons, the Court should resentence the defendants but deny their request for a new trial.

<div style="margin-left:40%">

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:   */s/ Stephen W. Hassink*
Stephen W. Hassink
Torey B. Cummings
Assistant United States Attorneys

</div>

Dated: April 16, 2026

<div style="text-align:center">

CERTIFICATE OF SERVICE

</div>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

<div style="margin-left:40%">

*/s/ Stephen W. Hassink*
Stephen W. Hassink
Assistant United States Attorney

</div>

Dated: April 16, 2026