**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES )<br><br>v. )<br> )<br>MOISES SOTO and )<br>KIERSTEN SOTO ) | Criminal Case 22-cr-40027<br>**Leave to File granted on May 28, 2026** |

## REPLY MEMORANDUM FILED BY DEFENDANTS IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL

Now come Defendants Moises Soto and Kiersten Soto (collectively, "the Defendants") and respectfully file this Reply Memorandum in support of their Motion for a New Trial (see ECF No. 286) and in response to the Opposition filed by the government (see ECF No. 310).

## STATEMENT OF FACTS

### I.      PROCEDURAL BACKGROUND

The Defendants were convicted after a six-day jury trial of conspiracy to commit sex trafficking, 18 U.S.C. § 1594(c) (Count 1), and sex trafficking by force, fraud, or coercion, 18 U.S.C. §§ 1591(a)(1), (b)(1), and 2 (Count 2). Kiersten Soto was additionally convicted of interstate travel and transportation to promote prostitution under the Travel Act, 18 U.S.C. § 1952 (Count 3).

The case was tried jointly before Judge Guzman from September 15 through September 22, 2025. The government's theory was that Moises and Kiersten forced C.B. – Kiersten's younger sister – to engage in prostitution between February and May of 2022. As the evidence demonstrated, and as a series of one-sided rulings prevented the jury from fully weighing, the true picture was substantially more complicated: the prosecution's central witness told a materially more damaging story at trial than she had told in any prior statement, and the jury never heard the evidence most relevant to evaluating why.

## II.  THE CHARGED CONSPIRACY

### A.  Background

C.B. is the younger half-sister of Kiersten by approximately eight and a half years. *(Tr. Day 2, p. 237.)* By the time the charged events began, Moises, Kiersten, and C.B. were living together at 64 Everard Street in Worcester and were addicted to opioids. *(Tr. Day 2, p. 240.)* No one in the house was employed; the household had survived on pandemic assistance that ended around the fall of 2021. *(Tr. Day 2, p. 242.)* C.B. also became addicted to Percocet while living at 64 Everard Street, having started by taste-testing pills for the Sotos. *(Tr. Day 2, p. 242.)*

Critically, all three adults had Suboxone prescriptions – the medication for opioid addiction – and C.B. admitted on cross-examination that all three were selling rather than taking them. *(Tr. Day 3, p. 425.)* C.B. also had her own independent relationship with the household drug supplier, "Bebo," going to pick up drugs from him alone by car or Uber, without the Sotos present.

### B.  C.B. Decides to Engage in Prostitution

The prostitution activity began on C.B.'s own initiative. She admitted on cross-examination that she heard about a website called Seeking.com from a friend, set up her own account, took her own photos, and arranged and traveled to a first date entirely without the Sotos' input. *(Tr. Day 3, p. 428.)* When she told Moises and Kiersten about it, they were skeptical and did not believe money could be made. *(Tr. Day 2, p. 247.)* After C.B. returned with $300 from that first date, she gave it to them.

Why she gave them that money was the subject of a significant and unresolved inconsistency between her trial testimony and her earlier grand jury account. At trial, on direct examination, she testified she gave the money to them because it was "expected" of her – framing it as the first act of coerced financial surrender. *(Tr. Day 2, p. 248.)* At the grand jury,

she had told a different story: she gave them the money because they had paid for summer vacation trips for her in 2021 and she felt she owed them for it: *(Tr. Day 3, p. 429.)*

> *Q: Because you had gone on a couple of trips with them in 2021, right? A: In the summer, yeah.*
>
> *Q: Like a summer vacation, basically, that they had paid for?*
>
> *A: Yeah.*
>
> *Q: And so you gave them that money back, because you felt like you kind of owed them for all of it –*
>
> *A: Well, I was told it was expected for me to provide for my family.*
>
> *Q: . . . Because they laid out money on your behalf the previous summer, right?*
>
> *A: Yeah.*

*(Tr. Day 3, pp. 429–30.)*

### C.     February Through May 2022

After Kiersten took over the Seeking.com account, C.B. testified at trial that she went on two to five prostitution dates per day across multiple states, *(Tr. Day 2, p. 272.)* was expected to earn $1,500 to $3,000 daily, *(Tr. Day 2, p. 281)* and was beaten by Moises for not answering her phone, missing dates, or returning with insufficient money. *(Tr. Day 2, p. 280.)* She testified that on at least one occasion Moises choked her until she lost consciousness, *(Tr. Day 2, p. 356)* and that the Sotos withheld her Percocet when she underperformed. *(Tr. Day 2, p. 282.)* The government introduced threatening Facebook messages it attributed to Kiersten, including a threat of "two black eyes" *(Tr. Day 2, p. 323)* and a threat that Moises was going to "fucking kill" her. *(Tr. Day 2, p. 331.)*

On direct examination, C.B. testified that "Antonio and Kiersten" controlled the drugs, that she had to ask for each dose, and that they were "set up on a board" for her. *(Tr. Day 2, p. 282.)* Exhibit 10.15 – a message in evidence – showed C.B. telling Moises she had already taken one pill and was deciding whether to take another, while deliberately hiding her drug use from her driver and customer Brad Darrach. The undisputed evidence also established that C.B. independently went to Bebo's house to pick up drugs – alone, by car or Uber – without the Sotos present. *(Tr. Day 2, p. 311.)*

As to financial-control, C.B. testified on direct that the proceeds were directed to Kiersten's Venmo and CashApp accounts because "they wouldn't have access" to accounts in C.B.'s name. *(Tr. Day 2, p. 287.)* Cross-examination revealed that C.B.'s own name was on the Bank of America account. *(Tr. Day 6, p. 901.)* Moreover, Darrach took her to ATMs where she deposited and withdrew money independently, without the Sotos present. *(Tr. Day 6, p. 901.)* And, as late as late March 2022 – seven weeks into the charged period – the Sotos were still requesting access to C.B.'s PayPal account, confirming she had exclusive control of it. *(Tr. Day 6, p. 902.)* She also frequently received cash and might have had $2,000 on her at any given time. *(Tr. Day 6, p. 902.)*

The attribution of Facebook and text messages further compromised by a foundational problem the government itself conceded. Moises, Kiersten, and even C.B. used each other's accounts interchangeably throughout the charged period, and for many messages the government could say only that the author was "either Kiersten Soto or Moises Soto." *(Tr. Day 5, p. 860.)* The Court admitted all such messages against Moises over his continuing authentication objection. *(Tr. Day 2, p. 277.)*

C.B. testified on direct that she could not leave the apartment without one of the Sotos watching her. *(Tr. Day 2, p. 384.)* Yet cross-examination revealed that she regularly visited Darrach's home – on the same Clinton street as her mother's house – staying overnight, alone, far from the Sotos' apartment. *(Tr. Day 2, p. 385.)* When messages showed Kiersten worried about C.B.'s whereabouts late at night, C.B. conceded on cross that Kiersten's concern was really about the money stopping, not about controlling her location. *(Tr. Day 2, p. 385.)* C.B. made unsupervised runs to Bebo's house for drugs. *(Tr. Day 2, p. 311.)* And when asked why, across three months of alleged trafficking, she never asked Darrach to drive her somewhere safe, she offered shifting and inconsistent explanations: *(Tr. Day 2, p. 388.)*

*Q: But you never asked Brad to take you to the police station, did you? A: No.*

*Q: You never asked Brad to take you to a hospital, did you?*

*A: No.*

*Q: You never asked Brad to take you to a rehabilitation facility?*

*A: I didn't want him to get hurt because of my decisions.*

*(Tr. Day 2, pp. 388–89.)* She also claimed she did not have a close relationship with her mother *(Tr. Day 2, p. 389)* – despite the fact that her mother regularly came to the apartment to pick up the Sotos' children.

Darrach – who himself paid C.B. for sex during this same period and who testified under an immunity agreement *(Tr. Day 4, p. 697.)* – acknowledged on cross-examination that he never perceived her to be acting against her will. *(Tr. Day 4, p. 712.)* C.B. regularly spent hours alone with him in his car and at his home during the very period she described as one of total captivity.

### D. The End of the Charged Conspiracy

C.B. left the apartment for good on approximately May 22, 2022, when she was picked up by Adrian Morin, a man paying her at least $1,000 per week, and was brought to a hotel. *(Tr. Day 3, p. 414.)* Morin was approximately thirty years older than C.B. *(Tr. Day 3, p. 414.)* The circumstances of the departure were contested; the government's own evidence established that three days passed before anyone reported C.B. missing – and when that report was made, it was the Sotos, not C.B., who called the police, because they were "concerned" they had not heard from her. *(Tr. Day 2, p. 389.)*

When the Marlborough police visited C.B. at the hotel the first of two times, she told them nothing about being trafficked. She testified that she was in the bathroom withdrawing "and didn't really talk to the police the first time." *(Tr. Day 3, p. 415.)* It was only during that hotel stay that she decided, by her own admission on cross-examination, to seek detox and make the trafficking allegation:

> *Q: While you were – just so I am clear for the record, while you were at the hotel*
> *with Adrian is when you came up with this idea?*
> *A: Yes. (Tr. Day 2, p. 392.)*

The federal investigation did not open until June 2022, when a Marlborough task force officer referred the case to HSI after meeting with C.B. *(Tr. Day 3, p. 476.)*

On direct examination, C.B. had testified that the Sotos manipulated her mother or grandmother into filing the M.G.L. Ch. 123, Section 35 civil commitment petition against her. *(Tr. Day 2, p. 355.)* See also Id. (noting that a "warrant" may issue to bring the person to court for commitment proceedings if they do not or will not appear voluntarily.) Yet the Section 35 proceeding was initiated by the Marlborough police as a result of contact that the Sotos

themselves had made – they had called police reporting C.B. missing because they were worried about her. *(Tr. Day 2, p. 389.)* And, upon her departure, they gave her pills to take with her. *(Tr. Day 6, p. 901.)* C.B. went into withdrawal only because Morin flushed those pills. *(Tr. Day 6, p. 901.)*

Adrian Morin – who himself paid C.B. for sex during this period and who testified under an immunity agreement *(Tr. Day 4, p. 697.)* – confirmed on cross-examination that he had never perceived C.B. to be acting under compulsion. When asked directly whether he believed she was being forced into prostitution, he answered no. *(Tr. Day 6, p. 941.)*

## III.     THE TRIAL RULINGS

The trial was marked by a series of rulings and judicial interventions that, individually and collectively, prevented both Sotos from presenting a fair defense. Each of these rulings should be viewed through the lens of what transpired during a break in the sentencing hearing, addressed in part IV, which caused the trial judge to recuse herself from any further proceedings. In addition, the trial judge's obvious contempt for the defense and defense attorneys throughout further compounded that structural disadvantage.

### A.  Pending criminal charges of C.B. excluded.

Before jury selection, the Court granted the government's motion in limine to bar any cross-examination of C.B. regarding her two open state felony drug cases – a 2025 fentanyl trafficking charge on which she had defaulted and a subsequent drug-distribution charge on which she also remained at large and for which, as to one, "Bebo" was her co-defendant. When Attorney Tumposky began to articulate this relevance theory, the Court cut him off:

> THE COURT: *So she's the kind of person that would make up a story about being*
> *sexually trafficked five years ago? . . . [I]t is a hallmark of our system that we do*

*not try people and use as evidence things that they have done that they have not*

*been convicted of in other cases. . . . I won't change the rules because it would be*

*more helpful for you perhaps, but the rule is very clear.*

*(Tr. Day 2, pp. 188–89.)* The Court then announced: "This discussion is done," *(Tr. Day 2, p. 190.)* and refused a full proffer. A motion for reconsideration filed after additional information became available was denied: "I will not hear you on another reconsideration on this same evidence." *(Tr. Day 3, p. 410.)*

### B. Rule 412 subsequent-acts evidence excluded without proffer.

The Court excluded evidence that C.B. continued to engage in prostitution after leaving the Sotos, *(Tr. Day 2, p. 232.)* directly relevant to whether the Sotos caused her commercial sex activity or whether it was independently chosen. The Court refused to hear a proffer. *(Tr. Day 2, p. 232.)*

### C. Judicial Bias and Hostility Towards the Defense

#### 1. Defense counsel was told to "sit down" and "stay seated" so as not to interrupt a government witness' answer with an objection; government counsel was allowed to interrupt a defense question.

During a single extended exchange, in response to a defense objection, the Court, in front of the jury, ordered Attorney Tumposky to "sit" and "stay seated" on two consecutive occasions, each time directing that the witness answer before any ruling was made. In the first instance, counsel objected and the Court responded: "All right, so the answer will stand. Sit." *(Tr. Day 2, p. 261.)* When counsel rose again on the very next question, the Court repeated:

*THE COURT: All right, sit down. She's going to answer the question and then*

*you can object and I can strike it but you are not even allowing her to answer. So*

*stay seated. I will note it's an objection. What is your answer, ma'am?*

*(Tr. Day 2, pp. 261–62.)*

Later during cross-examination, Attorney Tumposky began a question using the word "warrant" to describe an order of arrest pursuant to the state's Section 35 civil commitment process, a term used multiple times in the statute itself. The government objected before the question was complete. The Court sustained the objection *(Tr. Day 3, p. 417.)* before counsel could finish, then accused him at sidebar of deliberate professional misconduct: *(Tr. Day 3, p. 420.)*

> *THE COURT: No, your use of questioning is not enough. You need to do it –*
> *you're not a lawyer that is missing words. You are [trying to] leave the*
> *impression that she is a criminal, wanted by the police. You said it in your*
> *opening: She was going to blame somebody.*

*(Tr. Day 3, p. 420.)* The Court then *sua sponte* delivered a curative instruction to the jury explaining the nature of Section 35 – which neither party requested. *(Tr. Day 3, p. 420.)*

When Attorney Tumposky asked C.B. if she was suffering withdrawal symptoms the day she testified – the Court sustained the objection and volunteered a favorable characterization of C.B.'s condition on her behalf:

> *THE COURT: That was asked by Counsel Day, and she indicated she was not.*
> *She was suffering from a physical condition – not suffering, but reacting to a*
> *physical condition.*

*(Tr. Day 3, p. 428.)*

In multiple other instances across multiple trial days, government counsel objected while Attorney Tumposky's or Attorney Day's questions were still in progress, a tactic which the trial

judge never criticized or suggested was inappropriate. On two of those occasions counsel for Moises explicitly protested on the record.

For example, during Day's cross-examination of C.B., counsel asked whether she was aware of what Adrian Morin had told investigators about why he came to pick her up. The question was cut off before he could name the substance:

*Q: Are you aware that Adrian has said that he came there because – MR.*

*HASSINK: Objection. THE COURT: Sustained.*

*(Tr. Day 2, p. 389).*

When Tumposky was asking C.B. about the Section 35 warrant, Hassink objected before the question was finished.

*Q: And, in fact, the police also told you that they had a warrant –*

*MR. HASSINK: Objection.*

*THE COURT: Sustained.*

*MR. TUMPOSKY: May I be heard, Your Honor. I haven't even finished the*

*question.*

The Court took the matter to sidebar and thereafter accused Tumposky of deliberately trying to mislead the jury by the use of the term "warrant". *(Tr. Day 3, p. 417, 420.)*

During cross-examination of C.B. about the tone of a Facebook conversation, Hassink objected before the question could be completed:

*Q: And looking at this conversation, would you agree with me that the tone of this*

*conversation is –*

*MR. HASSINK: Objection.*

*THE COURT: Sustained.*

*MR. TUMPOSKY: I would like to be allowed to finish my question, Your Honor,*

*before the objection is lodged. I think that's appropriate.*

*(Tr. Day 3, p. 438.)* The Court did not instruct Hassink to wait until counsel had finished speaking.

Next, Tumposky was pressing C.B. on her knowledge that she could be arrested when Hassink objected simultaneously to the unfinished question and to Tumposky interrupting the witness's answer:

*A: They weren't arresting me, but no –*

*Q: But you knew that they potentially could –*

*MR. HASSINK: Objection. The witness was still answering.*

*THE COURT: And the objection is sustained. You can finish your answer.*

*(Tr. Day 3, p. 471.)*

When Tumposky was reading a Facebook message and identifying the sending account, AUSA Cummings objected mid-sentence:

*Q: And then the Moises [] Soto account –*

*MS. CUMMINGS: Objection, Your Honor. Can we go to sidebar, please?*

*THE COURT: Yes.*

*(Tr. Day 4, p. 656.)*

When Tumposky began a question about C.B.'s activities, Cummings again objected before it was complete:

*Q: And she would also –*

*ATTORNEY CUMMINGS: Objection. I apologize. The time period, I think, is off.*

*THE COURT: You'll have an opportunity to redirect.*

*(Tr. Day 5, p. 782.)* Although the Court overruled the objection, Cummings' tactic was left without comment.

Later, Attorney Day was interrupted during cross-examination of C.B. about who summoned Adrian Morin to the apartment:

*Q: Are you aware that Adrian has said that he came there because –*

*MR. HASSINK: Objection.*

*THE COURT: Sustained.*

*(Tr. Day 2, p. 389.)* In none of these instances did the Court require government counsel to wait for the question to be completed (or for the witness to answer) before objecting.

**2. The judge refused to allow authentication of a TextNow message in which C.B. purportedly admitted fabricating the trafficking allegations.**

During cross-examination of C.B., Attorney Tumposky presented the Court at sidebar with a message extracted from a phone seized from 64 Everard Street. The message was sent via TextNow – a mobile messaging application – on May 20, 2022, two days before C.B. left the apartment. The sender's number was an exchange beginning with 603; the recipient was identified by a different number. Attorney Tumposky represented that the content of the message indicated that C.B. had admitted to fabricating the sex-trafficking allegations against Moises and Kiersten. He offered it as a prior inconsistent statement. *(Tr. Day 3, p. 462.)*

The Court read the document and ruled immediately:

*THE COURT: It's not coming in under any circumstances.*

*(Tr. Day 3, p. 463.)* When Attorney Tumposky argued the document was a prior inconsistent statement, the Court responded that there was an authenticity issue. The Court then characterized the document as follows:

*THE COURT: Yes, and you know what it reads like? It reads like someone who was trying to create a defense for themselves.*

*(Tr. Day 3, p. 465.)* Attorney Tumposky objected that credibility determinations of that kind were for the jury:

*MR. TUMPOSKY: That's for the jury to decide, Your Honor.*

*THE COURT: No, only credible evidence can come in, that's what the jury gets to decide. And I get to decide what they get to see.*

*(Tr. Day 3, p. 465.)* The Court further ruled that Attorney Tumposky could not show the document to C.B. and ask whether she sent it. When Attorney Tumposky asked how he could authenticate it if he could not even ask C.B. whether she wrote it, the Court responded:

*THE COURT: I don't have to tell you how to be a lawyer. Just be a lawyer. You can investigate it, and you can try it. You can't do it here in front of a jury.*

*(Tr. Day 3, p. 468.)* Attorney Tumposky asked to be allowed to address authentication when the forensic agent who extracted the message from the phone testified. The Court said he could inquire about authenticity through the agent, but stated the message itself would not come in regardless: *(Tr. Day 3, p. 466.)*

*THE COURT: You are not going to bring the statement in, and then bring the horse to the front of it. You are going to do it behind the horse. If you have a documentation of someone who will authenticate that, then you will have to put them on the stand.*

*(Tr. Day 3, p. 466.)* When Attorney Tumposky proposed the alternative of asking C.B., without reference to the document, whether she had told anyone in May 2022 that she had made up the allegations against Moises and Kiersten, the government frivolously objected that even that

question called for hearsay. *(Tr. Day 3, p. 465.)* The Court permitted it *(Tr. Day 3, p. 465)* but its ruling that the document could not be shown to C.B. to ask if she sent it remained in place. *(Tr. Day 3, p. 468.)*

### 3. The judge *sua sponte* told the jury that a question from defense counsel relating to a witness' bias was inappropriate.

During cross-examination of Darrach, counsel for Moises was questioning him about his potential bias towards C.B. Counsel started by reviewing a Facebook exchange between Darrach and C.B. (which was under the Kiersten Soto Facebook account but by context was clearly sent by C.B.). Darrach could not recall the exact conversation and counsel thus tried to refresh his recollection. The Government objected and the parties approached sidebar:

*MR. TUMPOSKY: I'm not questioning him about the document any further, Your Honor. I'm asking if it refreshed his memory as to what their arguments were about.*

*THE COURT: Yeah. I think the questions are what was his reaction to a change of their relationship.*

*MR. TUMPOSKY: Correct. Exactly right. That's what I'm getting at.*

*MR. HASSINK: My objection at this point is he's asking basically what the argument was about. That's hearsay. It's a conversation between two people out of court. The statements are what he's trying to get in.*

*THE COURT: Just as long as we share what the document is. So please don't stray into what she said, because that would be hearsay. But what his perception was is –*

*MR. TUMPOSKY: Well, only to the extent that she said something, it's not for the truth but just to show the effect that it had on him –*

*THE COURT: Keep your voice down.*

*MR. TUMPOSKY: I'm sorry. Just to the extent that she said I don't want to be with you, I'm only offering that to show how it affected him.*

*THE COURT: You've already said that several times. So this is about his perception?*

*MR. TUMPOSKY: Correct.*

*THE COURT: Well, just keep it to what is permissible, which is his perspective. Okay. All right?*

*Tr. Day 4, pp. 704–705).*

Back in front of the jury, the following exchange took place:

*Q: So, in early May of 2022, you still desired to maintain your relationship with [C.B.]; correct?*

*A: Yes.*

*Q: But at some point in May of 2022, your perception was that actually she no longer desired to maintain that relationship with you?*

*A: Yes.*

*Q: And that upset you?*

*A: I was surprised, I guess.*

*Q: Because you had invested quite a bit of money in her; right?*

*A: I thought we became friends.*

*Q: And now she was telling you that you weren't and she didn't care about you?*

*MR. HASSINK: Objection.*

*THE COURT: Sustained.*

*Q: Was it your perception that despite your belief that you were friends that she no longer felt that way?*

*A: Yes.*

*Q: Did you attempt to convince her to change her mind?*

*A: I don't remember.*

*Q: If I show you something, might it refresh your memory as to whether you attempted to convince her to change her mind about breaking it off?*

*A: Yes.*

*(Witness shown document)*

*Q: Is your memory now refreshed about whether in an argument in early May of 2022, you tried to convince [C.B.] to stay in a relationship with you?*

*A: Yes.*

*Q: And is your memory now refreshed that she was very strongly opposed to doing so; that is, that your perception of her feelings were that she no longer wanted to?*

*A: Yes.*

*Q: And, in fact, isn't it true that she said if you contact me again, I'm going to accuse you of a very serious crime?*

*MR. HASSINK: Objection.*

*THE COURT: Sustained.*

*Q: Was it your perception –*

***THE COURT: And, ladies and gentlemen of the jury, that's not allowed to even be considered. So –***

*MR. TUMPOSKY: May we approach sidebar, Your Honor?*

*THE COURT: No, we may not. The ruling made at the sidebar stands.*

*Q: Was it your understanding that you needed to cease contact with her or face consequences?*

*MR. HASSINK: Objection.*

*THE COURT: Sustained.*

*(Tr. Day 4, pp. 705–707)*

*\*Back at sidebar*

*MR. TUMPOSKY: Your Honor, based on their text message exchanges that we have, essentially [C.B.] tells him if you continue to contact me, I'm going to accuse you of sexual assault. And I believe that's relevant to his state of mind towards her.*

*THE COURT: The document that you used to refresh his recollection was authored, according to the document, by Kiersten Soto, so is that the person –*

*MR. TUMPOSKY: Well, Your Honor, the authorship for these purposes is not relevant because it's his state of mind and he believes he was speaking to [C.B.]. Whether he was or not, it doesn't matter.*

*MR. HASSINK: Your Honor, he's essentially asking specific questions about statements made out of court and then asking what his understanding of it is and the statement is itself getting in and that is my objection to hearsay.*

*THE COURT: That is the objection. That is the objectionable part of all of this. You are back-dooring a hearsay statement.*

*MR. TUMPOSKY: I'm not, Your Honor, because I don't – I'm not contending that her accusation was true. I'm merely offering it to show how he would feel to be accused of something like that and, therefore, might be angry enough to – to hurt her, quite frankly.*

*MR. HASSINK: Your Honor, if he wanted to get these in, he could have tried to show them to a different witness, [C.B.]. And these are not the statements that are coming from an account that is now admittedly used by multiple people. We don't know who made these statements.*

*THE COURT: I also – if – listen, if you're going to use this, then the paper copy of that is going to come in showing who is linked as the individual whose account it is.*

*MR. TUMPOSKY: That's fine with me.*

*MR. HASSINK: Your Honor, I object to this exhibit coming in because that is pure hearsay. What I am saying is he's trying to get the statements in without even putting the documents in. I also objected to the statements. None of that should come in.*

*THE COURT: I agree. It's – it's confusing. It's – it's not satisfied by the evidence rules, and you have to cease discussing this document since there is no authenticity to it.*

*MR. TUMPOSKY: I'm not offering the document. Why does it need to be authenticated?*

*THE COURT: You're not. You're just using it a back door as if you had entered it. Move on. No more questions about what was contained in statements in the document.*

*(Tr. Day 4, pp. 708–709.)*

### 4. The judge chastised counsel in open court for not "listening" when he asked to have a question repeated.

After sustaining an asked-and-answered objection during Attorney Tumposky's cross-examination of Agent Hardie, Attorney Tumposky apologized that he had not heard the prior answer, the Court responded publicly:

*THE COURT: You should have been listening.*

*(Tr. Day 5, p. 828.)*

**5. Proposed instruction telling jury to disregard defense theory of the case as irrelevant only amended after the Government intervenes.**

During the charge conference, the Court proposed an instruction that evidence of C.B.'s ability to leave the apartment was "not relevant" to the coercion charges – an instruction that would have rendered moot three days of evidence the Court itself had permitted without objection. Attorneys Tumposky and Day both objected:

> *MR. TUMPOSKY: Your Honor, you allowed us without objection to elicit evidence from multiple witnesses that [C.B] had opportunities to leave. To then now turn and tell the jury that those opportunities, not only are they not determinative, but they simply aren't relevant and the jury should disregard them – . . . You're telling them to disregard facts that we have spent a lot of time trying to develop and were allowed to do so without objection.*

*(Tr. Day 4, pp. 738–39.).* It was government's counsel who then proposed the compromise language "not determinative" that was ultimately adopted, in lieu of the phrase "not relevant."

**6. The judge refused "to note" defense objection after privately selecting the jury alternates out of a hat in her chambers.**

After the closings, the Court privately selected alternate jurors to dismiss, off the record, and without notifying the defendants about the process until after it had already occurred. Counsel for Moises objected and the Court responded:

> *THE COURT: There's absolutely no obligation for the lawyers to participate in the jury selections for the alternates. None. I won't even note your objection. . . . I'm a judge. I'm sitting in my robe, and I've made a decision, and I showed you how I did it. And that's the end of this discussion.*

*(Tr. Day 6, pp. 979–80.)*

**IV.** ***EX PARTE* COMMUNICATION TO THE COMPLAINING WITNESS DURING A BREAK IN THE SENTENCING**

On January 23, 2026, the parties appeared before the Court for sentencing. The mandatory minimum sentence on Count 2 was 15 years (180 months). The Probation Department calculated a Sentencing Guidelines range of 188 to 235 months. The government recommended 18 years (216 months). The Defendants requested 15 years (180 months). The Court imposed a sentence of 18 years. C.B. did not attend the sentencing hearing and did not submit a victim impact statement.

On January 28, 2026 – five days after sentencing – AUSA Hassink sent an email to counsel for both Appellants disclosing the following:

*On Friday [January 23, 2026], while we were on a break during the sentencing hearing of your clients, one of Judge Guzman's interns/clerks approached [AUSA] Torey [Cummings] with an envelope. The intern stated that it was from the Judge and was for the victim. Torey did not open the envelope and did not know its contents. Torey handed the envelope to Agent Fleischmann. The sentencing hearing then resumed. After the sentencing hearing, we opened the envelope. It contained a card with a message in it from the Judge along with several seashells. We have not yet provided this to the victim and are happy to provide you with a copy of the card once we obtain it from HSI.*

On January 29, 2026, AUSA Hassink provided Appellants' counsel with photographs of the contents of the envelope. The envelope contained a store-bought card, a bracelet, and several seashells. The card had a handwritten note:

*[Victim's first name] – Every important journey in life starts with the 1st step.*

*You have shown great courage in your own journey to reclaim your life and your*

*future. I wish you much joy, love, and happiness and peace. MRG*

Neither the Defendants nor their counsel learned of the envelope's existence until AUSA Hassink's first email and thus did not have the opportunity to address the matter during the sentencing hearing, to object, or to seek recusal.

## LEGAL ARGUMENT

The government characterizes the trial judge's *ex parte*, secretive, and adulating communication with C.B. as a harmless expression of post-verdict sympathy that requires resentencing but not a new trial. That characterization reflects clever legal arguing, but it ultimately must fail because this motion for a new trial is not based on a judge's routine in-court statement to a victim during an open sentencing hearing. Instead, this motion is based on a private, undisclosed, *ex parte* personal communication with accompanying tangible gifts to the government's central witness, routed through the prosecution while the defendants' sentencing hearing was ongoing and before any sentence had been imposed.

The communication and gifting did not occur on the record and was not disclosed by the trial judge, and the defense had no opportunity to object, seek recusal, request inquiry, or ask that sentencing be continued. This combination of secrecy, timing, and highly personal content – coupled with C.B.'s central role as the government's principal witness – materially distinguishes this case from the "mere sympathy" authorities cited by the government.

Moreover, the trial judge's decision to send a very personal and *ex parte* message to C.B., which obviously was made well in advance of the sentencing hearing, bears directly on the multiple trial rulings in which the judge deprived the defendants of a meaningful opportunity to

cross-examine C.B. and introduce clearly relevant evidence regarding C.B.'s lack of veracity and the probative value of the prosecution's evidence. Consequently, this Court should reject the government's attempt to isolate the *ex parte* communication from the trial that preceded it, because the judge's private expressions of encouragement, love, and praise – coupled with gifts – cannot reasonably be separated from the multiple trial rulings in which the judge repeatedly exhibited bias in favor of C.B. and against the defendants.

I.     The "*Wright* Standard" Establishes the Defendants are Entitled to a New Trial

As recited by the government in its opposition, the First Circuit's "Wright Standard" requires the defendants to show:

1.     the newly discovered evidence of private communication and gifting "was unknown or unavailable to the defendant[s] at the time of trial;

2.     the defendants' "failure to learn of the evidence was not due to a lack of diligence by the defendant[s]";

3.     the new evidence "is material, and not merely cumulative or impeaching"; and,

4.     the new evidence "will probably result in an acquittal upon retrial of the defendant[s]."

See *United States* v. *Rodriguez-Marrero*, 390 F.3d 1, 14, 28 (1st Cir. 2004), quoting *United States* v. *Wright*, 625 F.2d 1017, 1019 (1st Cir. 1980)).

The government concedes the defendants have satisfied prongs (1) and (2) because, after all, the new evidence of *ex parte* secret private correspondence and gifting from the trial judge to the prosecution's central witness was hidden from the defendants while it was occurring during their sentencing hearing. As further detailed below, the defendants also have satisfied prongs (3) and (4).

The government's reliance on Rule 33 cases such as *United States v. Maldonado-Rivera*, 489 F.3d 60, 66 (1st Cir. 2007), *United States v. Rodriguez*, 738 F.2d 13, 18 (1st Cir. 1984), *Barrett v. United States*, 965 F.2d 1184, 1195 (1st Cir. 1992), *DeCologero v. United States*, 802 F.3d 155, 161 (1st Cir. 2015), and *United States v. Laureano-Salgado*, 933 F.3d 20, 32 (1st Cir. 2019) is misplaced, because this motion involves newly discovered evidence that is not merely another piece of impeachment evidence about C.B. To the contrary, the new evidence directly challenges the impartiality of the trial judge who presided over trial and who repeatedly restricted the defense's ability to challenge C.B.

Nor was the excluded evidence cumulative. The jury did not hear that C.B. faced pending drug charges tied to the same factual universe as the alleged coercion theory. The jury did not hear the full circumstances bearing on her ongoing relationship with the relevant drug supplier. And the jury did not see or hear authenticated evidence allegedly showing that C.B. had admitted fabricating the trafficking allegations. In a case where C.B.'s credibility supplied the government's interpretive framework, such evidence cannot be brushed aside as either routine impeachment or cumulative.

Finally, the defendants also satisfy the *Wright* Standard's fourth prong because the newly discovered evidence, viewed together with the trial record, would probably produce an acquittal upon retrial. The fourth prong does not require the Court to blind itself to the actual structure of the government's proof. To the contrary, *Wright* instructs that the probability-of-acquittal inquiry turns on how the new evidence would affect the jury's assessment of the government's case as tried. See *Wright*, 625 F.2d at 1019-20.

In *Wright*, the First Circuit denied relief because the new evidence would have been merely another attack on a witness whose credibility had already been challenged and whose

testimony was substantially corroborated. *Id*. Conversely, the newly discovered evidence in this matter is not simply another impeachment point against C.B. Instead, it is evidence that the trial judge privately aligned herself with the prosecution's central witness after having repeatedly curtailed the defense's ability to test that witness before the jury. This distinction is dispositive.

First Circuit decisions applying *Wright* confirm that the fourth prong is satisfied where the new evidence would change the jury's evaluation of a central witness or would materially alter the evidentiary picture on which the conviction rests. In *United States v. Natanel*, 938 F.2d 302, 313-14 (1st Cir. 1991), the Court emphasized that newly discovered evidence must be assessed in light of the whole trial record and whether it would probably produce acquittal. See, also, *United States v. George*, 448 F.3d 96, 101 (1st Cir. 2006); *United States v. Josleyn*, 206 F.3d 144, 156 (1st Cir. 2000). The scope of this inquiry is especially significant in a credibility-driven case such as the instant matter because, when the government's proof depends on a particular witness' account, evidence that would give the jury a materially different basis to evaluate that witness can satisfy the probability requirement. See, also, *Rodriguez-Marrero*, 390 F.3d at 14, 28 (evaluating the alleged new evidence against the trial evidence as a whole).

The First Circuit's *Brady* materiality decisions reinforce the same point in closely analogous terms. Although *Brady* and *Wright* articulate different standards, both ask whether the new information would have mattered in the real trial that occurred, not in the abstract. In *Conley v. United States*, 415 F.3d 183, 188-93 (1st Cir. 2005), the First Circuit affirmed relief where excluded impeachment evidence concerning a key government witness undermined confidence in the verdict, explaining that impeachment can make the difference between conviction and acquittal when a witness is essential to the government's case. The Court rejected the government's attempt to answer materiality by arguing that other evidence was legally sufficient;

the issue was whether the undisclosed evidence would have made the prosecution's case "markedly weaker" and the defense case "markedly stronger." *Id*.

Although *Conley* involved the *Brady* analysis, the same reasoning supports relief here. The government's case depended on C.B. to give meaning to the alleged coercion, drug-withholding, fear, money-flow, and commercial-sex-act evidence. If the jury had been allowed to hear the excluded evidence bearing on C.B.'s pending drug cases, her ongoing relationship with the same drug supplier, her condition while testifying, and the alleged TextNow fabrication admission, the government's case would have been markedly weaker and the defense case markedly stronger.

Indeed, the instant matter is stronger than the ordinary *Wright* motion because the new evidence does not merely impeach a witness; it undermines confidence in the neutrality of the tribunal that controlled what the jury was permitted to hear about that witness. A retrial before an impartial judge would not simply add one more impeachment exhibit. It would allow the defense to litigate C.B.'s credibility, motive, drug-related context, alleged fabrication, and condition while testifying without the taint of a judge who later demonstrated  a private, undisclosed, and personal alignment with C.B.

## II. This Matter Involves Material Evidence of Judicial Bias Much More Problematic than a Mere Expression of Sympathy to a Victim

The government's opposition relies on cases involving judges who expressed sympathy to victims at sentencing, but those cases are inapposite because the relevant facts are materially different. The government principally relies on *United States v. Johnson*, 163 F.4th 518, 523 (8th Cir. 2026), and *United States v. Minard*, 856 F.3d 555, 557 (8th Cir. 2017), even though those cases involved open-court sentencing comments, not secret *ex parte* personal messages and gifts routed through the prosecution. In *Johnson*, the challenged statements were made by the

sentencing judge in open court to a victim who had participated in the sentencing process. In *Minard*, the challenged statement was likewise a spontaneous, in-court expression following a victim's stressful appearance. Neither case involved a judge preparing a private written note and gifts, delivering them through the prosecution, intentionally failing to disclose the communication to the defense, and doing so while sentencing remained underway.

This distinction is dispositive. Open-court statements can be heard, objected to, preserved, and assessed in context. A secret *ex parte* communication cannot. The injury here is not merely that the judge expressed sympathy. The injury is that the judge privately aligned herself with the prosecution's essential witness in a manner the defense could not observe or challenge. *Johnson* and *Minard* therefore do not answer the question presented here.

The other cases cited by the government are similarly unavailing. *Prophet v. United States*, No. 14-00047-01-CR-W-DGK, 2016 WL 8928311 (W.D. Mo. Oct. 20, 2016) and *Preston v. Lattimer*, No. C 09-02262 WHA, 2011 WL 1748371 (N.D. Cal. May 6, 2011) involved comments or expressions of sympathy evaluated in collateral proceedings; they did not involve a judge's undisclosed private communication and gifts to the key prosecution witness, and they did not involve a trial record in which the judge had repeatedly restricted the defense's ability to test that same witness's credibility.

*Ryan v. Clarke*, 281 F. Supp. 2d 1008, 1034 (D. Neb. 2003), aff'd, 387 F.3d 785 (8th Cir. 2004), is likewise distinguishable. There, the challenged conduct involved meetings with family members of murder victims in the context of sentencing. *Ryan* did not involve undisclosed gifts routed through the prosecution to a key witness, nor did it involve a record of trial rulings limiting inquiry into that witness's pending charges, drug-related motive, physical condition, or alleged prior fabrication.

Conversely, the instant matter involves the trial judge's *ex parte* communication and gift-giving to the government's central trial witness – the same person whose testimony supplied the framework for the prosecution's coercion theory and whose cross-examination the trial judge had repeatedly restricted. Again, this distinction matters. A communication to a victim's family member after conviction does not damage the fair administration of justice, but a trial judge's secret personal communication and gifts to the very witness whose trial testimony was decisive and whose credibility the defense sought to test does cause such damage.

The government's reliance on *State v. Salsbury*, 346 Wis. 2d 279 (Ct. App. 2013) is also misplaced. In *Salsbury*, the defendant had pled guilty, and the challenged conduct occurred during sentencing when the court addressed a child victim. The Court of Appeals of Wisconsin emphasized that the case was at sentencing and that guilt was no longer in dispute. That is not this case. The defendants here were convicted after a contested jury trial in which the government presented C.B. as its principal witness of alleged coercion. *Salsbury* also did not involve undisclosed routing of gifts through the prosecution during an ongoing hearing without contemporaneous disclosure to the defense. Nor did it address whether a new trial is warranted when newly discovered evidence of personal judicial alignment with a central witness casts doubt on earlier trial rulings restricting confrontation and impeachment. It is therefore factually and legally inapposite.

In sum, the newly discovered communication and gifting requires a new trial not merely because it occurred at sentencing, but because it reveals the judge's personal view of the same witness whose credibility the defense had been prevented from fully testing at trial.

III.     **The Newly Discovered Evidence Is Material Because It Confirms the Trial Judge's Partiality Toward the Government's Essential Witness, Not Merely a Sentencing Error**

The judge's multiple trial rulings and statements, as detailed above, deprived the defendants of a meaningful opportunity to test C.B.'s credibility by addressing, without limitation, her pending drug cases involving the same dealer, her physical condition while testifying, and text messaging in which she admitted fabricating trafficking allegations. Although the government's prosecution was based on a theory that the defendants coerced C.B. into commercial sex acts by withholding drugs from her, the trial judge forbade all inquiry into C.B.'s two open drug cases that were in warrant status out of Worcester District Court at the time of trial. In one of those cases, her co-defendant was the same alleged drug dealer from whom the defendants in this case were accused of forcing C.B. to purchase drugs.

Further, the judge would not allow defense counsel even to attempt to authenticate messages in which C.B. admitted to fabricating allegations of sex trafficking against the defendants. Given this context, the newly discovered evidence does not stand apart from the trial record; to the contrary, it gives objective significance to the defense's claim that the judge's trial rulings repeatedly – and improperly – deprived the defendants of a fair trial.

The government's contrary position relies on an unreasonably constricted interpretation of materiality. Rule 33 asks whether the interest of justice requires a new trial. Where newly discovered evidence bears on the impartiality of the judge who presided over trial – particularly in a credibility-driven criminal case such as the instant matter – the question is not whether the new evidence itself would be admitted before a second jury as substantive proof of innocence. Instead, the question is whether the verdict was reached in a proceeding whose fairness can still command confidence. Due process requires a fair tribunal, and the appearance of justice is not a technicality. See *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864-865 (1988) (granting a new trial after observing "people who have not served on the bench are often all too

willing to indulge suspicions and doubts concerning the integrity of judges"); <u>*Caperton* v. *A.T.*</u>
*Massey Coal Co.*, 556 U.S. 868, 876 (2009), <u>quoting</u> *In re Murchison*, 349 U.S. 133, 136 (1955)
("It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'")

Indeed, the Supreme Court has emphasized that due process is concerned not only with proof of actual bias, but also with circumstances presenting a constitutionally intolerable probability of bias. *Williams v. Pennsylvania*, 579 U.S. 1, 8, 14 (2016) (objective risk of bias can violate due process even absent proof that the judge was actually biased). <u>See</u> <u>also</u> *Liljeberg*, 486 U.S. at 869-870, <u>quoting</u> *Public Utilities Comm'n of D. C. v. Pollak*, 343 U.S. 451, 466-467 (1952) ("The guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as be so in fact.")

The Supreme Court's expansive interpretation of required due process establishes that the trial judge's *ex parte* personal communication and gifting to C.B. with no notice to the defendants, while the sentencing was still underway, was not a neutral administrative act. It was a private message of personal praise and encouragement to the prosecution's key witness, accompanied by gifts, routed through the prosecution, and concealed from the defense until after sentence was imposed.

The government's reliance on Rule 33 cases such as *United States v. Maldonado-Rivera*, 489 F.3d 60, 66 (1st Cir. 2007), *United States v. Rodriguez*, 738 F.2d 13, 18 (1st Cir. 1984), *Barrett v. United States*, 965 F.2d 1184, 1195 (1st Cir. 1992), *DeCologero v. United States*, 802 F.3d 155, 161 (1st Cir. 2015), and *United States v. Laureano-Salgado*, 933 F.3d 20, 32 (1st Cir. 2019) is misplaced, because this motion involves newly discovered evidence that is not merely another piece of impeachment evidence about C.B. To the contrary, the new evidence directly

challenges the impartiality of the trial judge who presided over trial and who repeatedly restricted the defense's ability to challenge C.B.

Nor was the excluded evidence cumulative. The jury did not hear that C.B. faced pending drug charges tied to the same factual universe as the alleged coercion theory. The jury did not hear the full circumstances bearing on her ongoing relationship with the relevant drug supplier. And the jury did not see or hear authenticated evidence allegedly showing that C.B. had admitted fabricating the trafficking allegations. In a case where C.B.'s credibility supplied the government's interpretive framework, such evidence cannot be brushed aside as either routine impeachment or cumulative.

The government relies on the general principle that adverse rulings alone rarely establish judicial bias, but that argument is misplaced. The Defendants here rely on demonstrable bias throughout the trial record, including repeated restrictions on the defense's ability to examine C.B. and present evidence critical to C.B.'s testimony, combined with newly discovered evidence that the same judge privately communicated with and gave gifts to that same witness. When newly discovered evidence gives objective meaning to what otherwise might appear to be discrete trial rulings, the Court must consider the record as a whole. See *United States v. George*, 448 F.3d 96 (1st Cir. 2006); *United States v. Josleyn*, 206 F.3d 144 (1st Cir. 2000). When the record is viewed as a whole, the newly discovered evidence does not merely add another basis to cross-examine C.B.; it calls into question whether the jury's ability to assess C.B. was improperly curtailed by a judge who later revealed a personal, private, and undisclosed alignment with that witness.

**IV.** **The Government's "Mere Impeachment" Argument Misstates the Nature of the Excluded Evidence and the Resultant Constitutional Harm**

The government repeatedly labels the improperly excluded trial evidence as "merely impeaching." This characterization is incomplete at best and misleading at worst, because evidence showing (a) a witness's motive to curry favor, (b) fear of prosecution, (c) pending criminal exposure, (d) ongoing drug involvement with a key actor, (e) impaired condition while testifying, or (f) admission of a material fabrication does more than attack character. In this case, such evidence was central to the issue of whether the government proved the necessary coercion element at trial.

The distinction is especially important when, as in this case, the witness is central. The Confrontation Clause protects the right to expose facts from which jurors could draw inferences about a witness's reliability, bias, and motive to testify. See *Delaware v. Van Arsdall*, 475 U.S. 673, 678-679  (1986), quoting *Davis v. Alaska*, 415 U.S. 308, 316-317 (1974) ("We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."); *Olden v. Kentucky*, 488 U.S. 227, 232-233 (1988); *United States v. Abel*, 469 U.S. 45. 50 (1984) (Confrontation Clause "requires a defendant to have some opportunity to show bias on the part of a prosecution witness").

The defense theory was not that C.B. was generally a bad person because she used drugs, lied, or faced charges. Instead, defense counsel properly sought to demonstrate that C.B.'s testimony changed in material ways, that she had reasons to shape her account, and that the jury needed the full context to decide whether coercion and trafficking had been proved beyond a reasonable doubt. Where a witness is central to the prosecution's case, limits on cross-examination that prevent the jury from receiving a significantly different impression of that

witness's credibility implicate the Sixth Amendment. <u>See</u> *Van Arsdall*, 475 U.S. at 678-679; *Olden*, 488 U.S. at 232-233; *Abel*, 469 U.S. at 50; *Davis*, 415 U.S. at 316-317.

The government cites *Stephens v. Hall*, 294 F.3d 210, 224 (1st Cir. 2002), to argue that pending charges handled by a different prosecuting authority supply only a weak inference of bias. *Stephens* is inapposite because the defense theory here was not limited to a generic claim that C.B. hoped to curry favor with some prosecutor. Instead, the pending drug charges involved alleged fentanyl trafficking and distribution activity connected to the same drug world – and, according to the state court charging documents – the same drug supplier who was at the center of the government's coercion theory in this prosecution. The evidence therefore bore not only on possible favor-seeking, but also on C.B.'s ongoing relationship with the supplier, her independence in acquiring drugs, her motive to shift blame, and the accuracy of the government's portrayal that the defendants controlled her drug access.

Moreover, unlike *Stephens*, this case involved a central witness whose testimony supplied the government's narrative. The excluded evidence did not concern a marginal witness or a collateral matter; it went directly to the witness whose credibility and interpretation of events determined whether the government proved coercion beyond a reasonable doubt. *Davis*, *Van Arsdall*, *Olden*, and *Abel*, clearly establish defendants are entitled to expose facts from which the jury could evaluate a central prosecution witness' motives and reliability.

The government also cites *Kunz v. DeFelice*, 538 F.3d 667, 676-677 (7th Cir. 2008), *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987), and *United States v. Kearney*, 420 F.2d 170, 173-174 (D.C. Cir. 1969), for the general proposition that courts may limit drug-use evidence offered merely as a character attack. Those cases are wholly inapposite to the instant matter, because the defense in this case did not seek to attack C.B.'s character merely because

she had used drugs. Instead, the defense sought to examine whether C.B.'s physical condition and drug-related circumstances affected her perception, memory, presentation, and motive to testify in a particular way. Indeed, the government's own authorities recognize that drug-use evidence may be admissible where it relates to a witness's ability to perceive, remember, or recount events. That is precisely why the excluded inquiry mattered here. The prosecution's theory depended on drug withholding and opioid withdrawal as mechanisms of coercion. C.B.'s drug use, access to drugs, relationship with the supplier, and condition while testifying were not collateral matters; they were embedded in the government's theory and in the defense's response to that theory. These authorities therefore do not support the broad exclusion imposed at trial; instead, they actually support the defendants right to elicit such testimony from C.B.

Moreover, the government's own opposition confirms the centrality of C.B.'s testimony, because it describes C.B.'s testimony as the narrative backbone for the alleged coercion, violence, drug withholding, prostitution dates, money flow, and fear of returning to the defendants. The government then argues that other evidence corroborated her testimony, but this alleged corroboration is precisely why the defense was entitled to  meaningful cross-examination: many of the messages, events, and relationships required interpretation, and C.B.'s credibility supplied the interpretive framework. If the jury had been permitted to hear that C.B. had pending drug cases involving the same dealer, that she maintained an ongoing relationship with that dealer, that her condition at trial raised questions counsel was not permitted to explore, and that there were messages allegedly admitting fabrication, the jury's evaluation of the entire evidentiary picture would have changed. See *Drumgold v. Callahan*, 707 F.3d 28, 39 (1st Cir. 2013) (improperly limited cross-examination of key witnesses can be material where it undermines confidence in the verdict).

Perhaps most significantly, the judge improperly denied the defendants an opportunity to authenticate the TextNow message in which C.B. had admitted to fabricating the sex-trafficking allegations against the defendants. This message was seized from a phone at the apartment, and counsel sought to use it as a prior inconsistent statement. The judge did not merely require a foundation; instead, she stated, before authentication could even be attempted with C.B., that the message was "not coming in under any circumstances." This ruling far exceeded proper ordinary evidentiary management, and it improperly foreclosed the defense from asking the most basic authentication question of whether C.B. wrote or sent the message, even though the alleged statement went to the core of the prosecution.

Authentication is a threshold question, not an invitation for the court to decide ultimate credibility. Indeed, Rule 901 requires only evidence sufficient to support a finding that the item is what the proponent claims it is; once that prima facie showing is made, disputes about authorship, weight, and credibility are for the jury. See Fed. R. Evid. 901(a); *United States v. Vayner*, 769 F.3d 125, 130 (2d Cir. 2014) (once authenticated, "[t]he ultimate determination as to whether the evidence is, in fact, what its proponent claims is thereafter a matter for the jury"). The court's refusal even to permit the defense to ask C.B. whether she sent the message prevented the defendants from attempting to authenticate an obviously – and materially – relevant line of evidence that likely would have resulted in acquittal if the jury had been allowed to consider it.

## V. The Record Shows More Than Isolated Adverse Rulings; It Shows a Pattern That the Newly Discovered Evidence Makes Objectively Significant

The government invokes the principle that judicial rulings alone ordinarily do not establish bias. While the defendants do not dispute that general rule, their instant motion does not rest on rulings alone. Instead, this motion is based on the judge's improper trial rulings plus

newly discovered extrajudicial conduct that objectively suggests the judge viewed C.B. through a personal, protective lens inconsistent with judicial neutrality.

More specifically, and without limitation, the record reflects repeated actions by the judge that improperly and unfairly disadvantaged the defense in front of the jury. Defense counsel was told to "sit" and "stay seated" when objecting during C.B.'s testimony, while government interruptions of defense questions were not treated the same way. The judge accused counsel of trying to leave the impression that C.B. was a criminal when counsel attempted to question her about a Section 35 warrant. The Court *sua sponte* instructed the jury that a defense question bearing on Mr. Darrach's bias was "not allowed to even be considered," then refused counsel's request to approach sidebar. After the verdict, the Court refused even to note an objection concerning the private selection of alternate jurors, stating: "I'm a judge. I'm sitting in my robe, and I've made a decision … I won't even note your objection."

The government's opposition invites this Court to view each of the judge's multiple improper rulings and statements in isolation and then characterize each ruling and statement as ordinary trial management. The government's interpretation is fatally undermined, however, by the newly discovered *ex parte* personal note and gifts from the trial judge to C.B. More specifically, the issue is not whether each and every ruling and statement independently proves actual bias; instead, the issue is whether the defendants received a trial before a judge whose impartiality is reasonably and objectively in dispute because she privately sent a personal message and gifts to the government's key witness praising her courage and expressing her love and admiration.

The sentencing transcript further reveals the judge's transition from neutral jurist to protective advocate. Before imposing sentence, the judge described C.B. in unusually personal

terms and characterized her as "our victim." While evocative sentencing language is not itself improper after conviction, the judge's characterization of C.B. in such personal terms, when combined with the *ex parte* undisclosed personal note and gifts prepared by the judge prior to the hearing, confirms that judicial bias in favor of C.B. deprived the defendants of a fair trial.

As established by the Supreme Court in *Liteky v. United States*, 510 U.S. 540, 555 (1994), judicial remarks and rulings may establish bias where they reveal deep-seated favoritism or antagonism making fair judgment impossible. Similarly, *Caperton*, 556 U.S. at 877, quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975), confirms there may be "circumstances 'in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'"

In short, the instant case presents more than ordinary courtroom impatience or adverse evidentiary rulings. Instead, it presents multiple adverse and improper trial rulings and statements limiting scrutiny of the prosecution's central witness, followed by newly discovered evidence that the judge secretly sent that witness a personal note of praise and tangible gifts through the prosecution.

## VI.  Resentencing Alone Does Not Remedy the Constitutional Harm Revealed by the Newly Discovered Evidence

The government consents to resentencing because the *ex parte* act occurred during that proceeding, but otherwise opposes the defendants' right to a new trial. Its proposed remedy assumes that the judge's personal alignment with C.B. first arose during the sentencing break and had no bearing on the trial, but the record does not permit that assumption.

More specifically, the note and gifts were not spontaneous remarks delivered after hearing a victim impact statement. C.B. did not attend the sentencing and did not submit a victim impact statement. The judge nevertheless had a store-bought card, a handwritten message,

seashells, and a bracelet delivered for C.B. through the prosecution before sentencing concluded. The fact that the card and gifts had been prepared in advance supports the reasonable inference that the judge's personal view of C.B. existed well before the sentencing hearing. Consequently, because the judge's demonstrably pre-existing personal views concerned the same witness whose credibility the defense had repeatedly been denied an opportunity to test at trial, the remedy cannot be limited to a new sentencing before a different judge.

Indeed, the government's proposed remedy would leave untouched the multiple trial rulings that, without limitation, prevented the defense from exploring pending state drug charges tied to the same dealer at the center of the government's coercion theory, prevented meaningful inquiry into whether C.B.'s condition while testifying affected her perception, memory, or presentation, and prevented defense counsel from attempting to authenticate that messaging that arguably contained an admission by C.B. that the trafficking allegations were fabricated. Simply stated, a new sentencing does not cure a trial in which the jury was improperly prevented from hearing relevant evidence regarding C.B.'s credibility, motivation, and veracity.

The government's position also conflicts with the principle that a defendant has a constitutional right to present a meaningful defense and to expose facts from which jurors may assess the reliability and motives of the prosecution's witnesses. See *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), quoting *California v. Trombetta*, 467 U.S 479, 485 (1984) ("[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"); *Holmes v. South Carolina*, 547 U.S. 319, 331 (2006). The trial judge in the instant matter deprived the defendants of this right, and the judicial bias that caused her to do so was revealed by the newly discovered evidence of the judge's secret, personal alignment with C.B.

## CONCLUSION

The trial in this case was infected with demonstrable judicial bias, made apparent by the judge's unprecedented and improper behavior during a break in the sentencing hearing. Therefore, this Court should reject the government's request to limit relief to resentencing, grant the defendants' Rule 33 motion, vacate the convictions, and order a new trial.

| | |
|---|---|
| Respectfully submitted,<br>**MOISES SOTO**<br>By his attorney, | Respectfully submitted,<br>**KIERSTEN SOTO**<br>By her attorney, |
| /s/ Michael Tumposky | /s/ John S. Day |
| Michael Tumposky (BBO #660618)<br>Tumposky & Associates, P.C.<br>88 Broad Street, Suite 101<br>Boston, MA 02110<br>(617) 722-8220 (telephone)<br>Tumposky@TumposkyLaw.com (email) | John S. Day (BBO #639249)<br>Day Law Firm, P.C.<br>99 Derby Street, Suite 200<br>Hingham, MA 02043<br>781-789-3001 (telephone)<br>jday@daylaw.com (e-mail) |
| Date: May 28, 2026 | Date: May 28, 2026 |

## CERTIFICATE OF SERVICE

I, John S. Day, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 28, 2026.

/s/ John S. Day

John S. Day, Esquire